JUDGE SULLIVAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**10 CV 9406**

---

MELODRAMA PUBLISHING LLC,

*Plaintiff*,

- against -

K.S. PUBLICATIONS and
KIKI SWINSON,

*Defendants*.

---

Case No.

**NOTICE OF REMOVAL**



RECEIVED
DEC 1 7 2010
U.S.D.C. S.D. N.Y.
COMPLETED

---

Defendants, K.S. Publications and Kiki Swinson ("Defendants") hereby remove

the above-captioned action to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446 on the

following grounds:

1.    On or about September 15, 2010, a civil action was commenced by Plaintiff and

then-Co-Plaintiff Winslow Shim Literary Agency, Inc. against the Defendants and the now-

discontinued Co-Defendants Kensington Publishing Corp., Dafina Books and Selina James (the

"Discontinued Defendants") in the Supreme Court of the State of New York, County of Suffolk,

Index No.10-34085 (the "State Action"). The State Action was transferred by consent to the

Supreme Court of the State of New York, New York County, and assigned Index No. 403325/10.

2.    Because the Discontinued Defendants, like the Plaintiffs, were citizens of the

State of New York within the meaning of 28 U.S.C. § 1332(a), and because this action arises

solely under state law, the Complaint as originally filed did not provide federal subject matter

jurisdiction. However, on November 23, 2010, Plaintiff served the attached Amended Complaint

on the Defendants. The Amended Complaint is between a New York Plaintiff and two Virginia Defendants, and makes claims in excess of $75,000, exclusive of interest and costs. Accordingly, the Amended Complaint provided for the first time in this action a basis for original subject matter jurisdiction in this Court.

3.     This Notice of Removal is being filed within thirty days of receipt by Defendants of the Amended Complaint, as required by 28 U.S.C. § 1446(b).

4.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiff is a citizen of New York (a New York limited liability company with its principal place of business in Bellport, New York) and the Defendants are citizens of Virginia (respectively, an unincorporated entity with its place of business in Virginia Beach, Virginia and a resident of Virginia Beach, Virginia), and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Accordingly, this Court has removal jurisdiction over this action pursuant to 28 U.S.C. §§ 1441(a) and 1441(b).

6.     Written notice of this Notice of Removal shall promptly be given to the attorneys for Plaintiff and shall be filed, along with a copy of the Notice of Removal, with the Clerk of the Supreme Court of the State of New York, County of New York, as required by 28 U.S.C. § 1446(d).

WHEREFORE, Defendants pray that the above-captioned action be removed, without waiver of procedural or substantive defenses, from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

Dated:  New York, New York
        December 17, 2010

**LYNN & CAHILL LLP**

John R. Cahill (JC-4229)
Ronald W. Adelman (RA-8633)
58 West 40th Street
New York, New York 10018
*Attorneys for Kiki Swinson and
K.S. Publications*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

Melodrama Publishing LLC

Index No.:

Plaintiff,

-against-

**VERIFIED AMENDED**
**COMPLAINT**

K.S. Publications and Kiki Swinson,

Defendants.

---

The Plaintiff, Melodrama Publishing LLC brings this action against the

Defendants captioned above for damages and other relief, and alleges as follows:

### Jurisdiction and Venue

This Court has jurisdiction because the amount of relief sought is in excess of

$25,000, and both parties do business within the County of New York.

### Plaintiff

1.     Plaintiff Melodrama Publishing LLC (hereinafter "Plaintiff MP LLC")

is a registered New York State Limited Liability Company doing business in the

County of New York, State of New York.

### Defendants

2.     Defendant K.S. Publications (hereinafter "Defendant K.S.

Publications"), upon information and belief, is a corporation or other entity doing

business in the County of New York, State of New York.

3.     Defendant Kiki Swinson (hereinafter "Defendant Swinson"), upon

information and belief, is a resident of the State of Virginia, and does business in the

County of New York, State of New York, under her own name, as an author and
publisher.

## STATEMENT OF FACTS

### Melodrama Publishing and Kiki Swinson (2000-2004)

4.     Crystal Lacey Winslow (hereinafter "Pres. Winslow") is the
President of Plaintiff MP LLC, which she founded and has operated since 2001.
Plaintiff MP LLC is in the business of publishing fictional books for the urban literary
marketplace.

5.     Since 2001, Pres. Winslow has worked diligently, and has expended
significant capital, to grow Plaintiff MP LLC into a literary brand recognized by
publications such as *Black Enterprise Magazine, Essence Magazine* and *Publisher's
Weekly*.

6.     This success is attributable not just to the expenditure of significant
resources and capital by Plaintiff MP LLC, but also to Pres. Winslow's individual
commitment and investment of time and efforts to develop and foster the careers of
each and every writer whose works are published by Plaintiff MP LLC.

7.     In or about the year 2000, Defendant Swinson self-published her
first novel entitled *Mad Shambles*. Due to her lack of success with *Mad Shambles*,
Defendant Swinson sought to have her book published by another publishing
company and came across Plaintiff MP LLC.

2

8.     In or about 2004, Pres. Winslow's self-published *Life Love and Loneliness*, and *The Criss Cross* novels and was thereafter introduced to Defendant Swinson by a mutual acquaintance.

9.     In or about July 2004, Defendant Swinson signed her first publishing contract with Plaintiff MP LLC.

10.    In an effort to create and promote the name brand for Defendant Swinson's first novel, *Wifey*, Pres. Winslow tied her name, Crystal Lacey Winslow, to Defendant Swinson's work via endorsements intended to interest Pres. Winslow's audience in Defendant Swinson's first novel published by Plaintiff MP LLC.

11.    Plaintiff MP LLC expended significant capital and resources to promote the *Wifey* release by and through a comprehensive sales and marketing campaign.

12.    Defendant Swinson's *Wifey* was published by Plaintiff MP LLC in December 2004 and instantly became an *Essence* magazine best selling book.

### Ki Ki Publishing (2005)

13.    Following the success of *Wifey*, in or about, April 2005, Defendant Swinson informed Pres. Winslow that she would not sign a new contract with MP LLC and would instead start her own publishing house: *Ki Ki Publishing*.

14.    Through *Ki Ki Publishing*, Defendant Swinson republished her first independent novel *Mad Shambles*. The re-publication of *Mad Shambles* through Defendant Swinson's company, *Ki Ki Publishing*, saw no success.

3

15.     Unsuccessful on her own, and mindful of Pres. Winslow's significant investment in Plaintiff MP LLC, Defendant Swinson once again sought out Pres. Winslow in the hopes of signing a new publishing contract with Plaintiff MP LLC.

16.     Defendant Swinson was signed to a new contract with Plaintiff MP LCC to publish her second book, *I'm Still Wifey*, through Plaintiff MP LLC.

17.     *I'm Still Wifey* was published by Plaintiff MP LLC in November 2005.

18.     As was the case with *Wifey*, Plaintiff MP LLC expended significant capital and resources to promote the *I'm Still Wifey* release by and through a comprehensive sales and marketing campaign.

19.     Like Defendant Swinson's first book with Plaintiff MP LLC, *I'm Still Wifey* quickly became an *Essence* magazine best selling book.

## Mass Market Licensing/Publishing (2006-2009)

20.     After the success of *I'm Still Wifey*, Defendant Swinson expressed interest in also having Crystal Winslow's literary agency, Winslow Shim Literary Agency, Inc. represent her (Defendant Swinson) as her agent for the purpose of negotiating with major publishers to secure a sub-licensing agreement for the mass marketing rights to Defendant Swinson's *Wifey* and *I'm Still Wifey* novels, all for the purpose of increasing readership and growing the series' name brand.

21.     To increase the likelihood that a major publisher would be interested in sub-licensing Defendant Swinson's work, Plaintiff MP LLC continued to develop Defendant Swinson's brand, image, and value, re-signing her to Plaintiff MP LLC for

4

additional publishing contracts including: *The Candy Shop/Life After Wifey* (2006) (this contract hereinafter referred to as "MP LLC Deal 1"), *A Sticky Situation* (2007), and *Still Wifey Material* (2008).

22. On or about February 2007, Plaintiff MP LLC published Defendant Swinson's book *The Candy Shop* pursuant to MP LLC Deal 1.

23. In or about August 2009, MP LLC offered to sign Defendant Swinson to two, full-length book contract deals, each for one title with an option clause for the sequel/follow up to each work (these agreements hereinafter referred to as "MP LLC Deal 2" and "MP LLC Deal 3").

24. Thereafter, Defendant Swinson accepted the terms and conditions of the proposed MP LLC Deals 2 and 3.

25. MP LLC Deal 2 was for the novel, *Wifey 4 Life (Part 5)*, which was published in March 2010.

26. MP LLC Deal 3 was for *Who's Notorious Now?*, which was supposed to be published in November 2010.

## Defendant Swinson's Breaches of Contract (Dec. 2009 to October 2010)

27. On December 28, 2009, with less than 4 weeks before the book *Wifey 4 Life (Part 5)* was to be printed and shipped to all the major retailers as per MP LLC Deal 2, Defendant Swinson, in breach of MP LLC Deal 2, still had not turned in her past due revisions for the *Wifey 4 Life (Part 5)* manuscript.

5

28.     Since Defendant Swinson missed her deadlines for revisions and did not return Pres. Winslow's calls and messages of December 26 and 28, 2009 in which she pleaded with her to hand in the revised manuscript, Pres. Winslow sent her a letter on behalf of MP LLC informing her that *Wifey 4 Life (Part 5)* would be published without her past due revisions.

29.     On January 1, 2010, MP LLC moved forward with plans to publish *Wifey 4 Life (Part 5)*, without Defendant Swinson's revisions, which she never submitted.

30.     On or about February 23, 2010, after receiving an apologetic email from Defendant Swinson regarding her missing the manuscript deadline for *Wifey 4 Life (Part 5)*, Pres. Winslow reached out to Defendant Swinson to see if further business could be conducted between them.

31.     During this conversation, Defendant Swinson assured Pres. Winslow that if MP LLC signed her to another publishing contract, she would improve her work ethic and would not miss the deadline for her next title *Who's Notorious Now?* (MP LLC Deal 3) to be released November 2, 2010.

32.     On Monday, March 1, 2010, Pres. Winslow received an email from Defendant Swinson reaffirming her position that she was interested in signing another deal with Plaintiff MP LLC.

33.     On March 4, 2010, Pres. Winslow sent Defendant Swinson a proposal from Plaintiff MP LLC to publish her next works.

6

34.    On March 11, 2010, Pres. Winslow discovered that Defendant Swinson
had been utilizing the social networking site, Facebook, for several weeks in an
effort to: (a) gauge public interest in sequels to her books published by Plaintiff MP
LLC and (b) to let the public at large know that she (Defendant Swinson) had started
her own publishing company, Defendant K.S. Publications ("Defendant K.S.").

35.    On March 19, 2010, Defendant Swinson contacted Pres. Winslow to
turn down Plaintiff MP LLC's latest contract offer.

36.    On March 31, 2010, one day before the *manuscript* deadline,
Defendant Swinson handed in the *synopsis* (as opposed to the *manuscript*) for
*Who's Notorious Now?* (MP LLC Deal 3). In that e-mail, Defendant Swinson also
requested a ten (10) day extension to hand in the *manuscript*.

37.    On April 10, 2010, Defendant Swinson missed the second deadline
extension for *Who's Notorious Now?* (MP LLC Deal 3).

38.    On May 18, 2010, Defendant Swinson finally handed in the
manuscript for *Who's Notorious Now?* (MP LLC Deal 3) a month and a half late and
15,000 words short.

39.    On May 18, 2010, Pres. Winslow emailed freelance editor
Melissa Forbes ("Ms. Forbes") to hire her for June 2010 to edit the *Who's Notorious
Now?* manuscript in the hopes of releasing the book (MP LLC Deal 3) on its
scheduled November 2, 2010 publication date.   Ms. Forbes was familiar with

7

Defendant Swinson's work (and vice versa) since she had previously been hired by Plaintiff MP LLC to edit other titles by Defendant Swinson.

40.     In her reply to Pres. Winslow, Ms. Forbes, who has been Plaintiff MP LLC's lead editor since 2006, informed Pres. Winslow that Defendant Swinson had already booked her for the next month to edit books for Defendant K.S.

41.     On May 27, 2010, Pres. Winslow discovered on Amazon.com that Defendant K.S. planned to release two new books *Still Candy Shopping* (August 24, 2010) and *Wifey Extraordinaire* (December 2, 2010)(both dates as per amazon.com at the time).

42.     Because the *Who's Notorious Now?* book (MP LLC Deal 3) was due to be released on November 2, 2010 by Plaintiff MP LLC, Defendant K.S.' plan to release *Still Candy Shopping* on August 24, 2010 through K.S. Publications was in breach of MP LLC Deal 3, which called for *Who's Notorious Now?* to be Defendant Swinson's next release.

43.     Moreover, the plan to publish *Still Candy Shopping* and *Wifey Extraordinaire (Part 6)* was in breach of MP LLC Deals 1 and 2, respectively.

44.     On or about May 24, 2010, Pres. Winslow was contacted by Plaintiff MP LLC's freelance graphic designer, "Candace" who informed Pres. Winslow that Defendant Swinson had offered her (Candace) a job designing book covers for Defendants Swinson and K.S. Publications (Candace turned down the offer).

8

45. On or about May 28, 2010, Pres. Winslow telephoned Defendant Swinson in an effort to convince her to forego publishing *Still Candy Shopping* and *Wifey Extraordinaire (Part 6)* through Defendant K.S. Publications since it would be in breach of MP LLC Deals 1, 2 and 3.

46. On June 13, 2010, Pres. Winslow sent Defendant Swinson a follow up email asking her to make her revisions to the *Who's Notorious Now?* manuscript in order to meet the November 2, 2010 publishing date. Defendant Swinson did not respond.

47. On or about June 14, 2010, Pres. Winslow again sent Defendant Swinson a follow up email asking Defendant Swinson to forego her plan to breach MP LLC Deals 1, 2 and 3 by moving forward with Defendant K.S.' scheduled publication dates. Defendant Swinson did not respond.

48. On June 16, 2010, Pres. Winslow was contacted by a representative at the print manufacturer, Malloy Incorporated ("Malloy Inc."), to notify her that Defendant Swinson had contacted Malloy Inc. and Representative Carol Bystrum directly to inquire about printing books.

49. After calls with editors, designers and printers revealed that all had been contacted by Defendant Swinson, it became clear that Defendant K.S., through Defendant Swinson's actions, was deliberately misappropriating MP LLC's business relationships and contacts. These same relationships, business contacts and goodwill created by Plaintiff MP LLC were the result of my nine (9) years of investment and efforts on the behalf of Plaintiff MP LLC.

9

50.     Defendant Swinson's misappropriation of Plaintiff MP LLC's business relationships and contacts for herself and Defendant K.S. all took place during the time that Defendant Swinson continued to neglect her contractual obligation to finish the manuscript for *Who's Notorious Now?* as per the terms of MP LLC Deal 3.

## Cease and Desist Letters to Defendants

51.     On July 2, 2010, Pres. Winslow sent Defendant Swinson a letter dated July 1st, 2010 (the "July 1st Letter") accepting the *Who's Notorious Now?* manuscript.

52.     In the July 1st letter, Pres. Winslow advised Defendant Swinson that in light of her failure to submit the full *Who's Notorious Now?* manuscript by or before the agreed upon deadline, the *Who's Notorious Now?* manuscript, though accepted, could not be published until June 2012 because of scheduling conflicts proximately resulting from the elaborate revisions necessary before Defendant Swinson's poorly written manuscript could be published.

53.     The July 1st letter further advised Defendants Swinson and K.S. to cease and desist from the plan to publish the titles listed below, among others, through Defendants K.S., since the publication of those titles on the proposed dates (listed below) would be in breach of MP LLC Deal 1 (*The Candy Shop*), MP LLC Deal 2 (*Wifey for Life: Part 5*) and MP LLC Deal 3 (*Who's Notorious Now*):

(a)     *Still Candy Shopping* (Previously titled *Candy Shop 2: Faith Fights Back*)
        Release Date: October 19, 2010 (Originally scheduled for August 24, 2010,
                      was published in mid-October)
        Publisher:    KS Publications

10

(b)   *Wifey Extraordinaire: Part 6*
      Release Date:   May 3, 2011 (Now scheduled for February 15, 2011)
      Publisher:      KS Publications

54.   On July 19, 2010, Pres. Winslow sent the legal department of

Amazon.com ("Amazon") a letter dated July 19, 2010 in which Amazon is asked to

cease and desist from its plan to sell and distribute the above-referenced titles.

Amazon did not respond.

55.   On or about October 19, 2010, Defendant K.S. published *Still Candy*

*Shopping* in breach of both MP LLC Deals 1 and 3.

56.   As of this date, Defendant Swinson and Defendant K.S. plan to publish

*Wifey Extraordinaire: Part 6* on or about February 15, 2011, in anticipatory

repudiation of MP LLC Deal 2.

## I.
## BREACH OF PUBLISHING CONTRACT
### (MP LLC Deal 1 – *The Candy Shop*)

57a.   Plaintiff MP LLC repeats each and every allegation contained in

paragraphs 1 through 56 as if fully stated herein.

57b.   On or about June 20, 2006, Plaintiff MP LLC and Defendant Swinson

entered into a publishing contract ("MP LLC Deal 1", see Exhibit A).

58.   Through MP LLC Deal 1, the book's author, Defendant Swinson,

exclusively licensed the copyright to *The Candy Shop*, including any renewals and

extension throughout the world, to Plaintiff MP LLC.

11

59.     Under MP LLC Deal 1, Defendant Swinson agreed to refrain from
exercising or disposing of any rights that would detract from, impair or frustrate the
value of any rights granted to Plaintiff MP LLC.

60.     Under MP LLC Deal 1, Defendant Swinson also agreed to refrain from
publishing, or permitting to be published, any book or other writing based
substantially on subject matter, material, characters or incidents in *The Candy Shop*
without the written consent of the publisher.

61.     *The Candy Shop* was published by MP LLC on or about February 2007.

62.     On or about October 19, 2010, Defendant Swinson, by and through
Defendant K.S., published a book entitled *Still Candy Shopping*, which publication
was facilitated by Defendant Swinson's misappropriation of Plaintiff MP LLC's
business contacts.

63.     *Still Candy Shopping* is a sequel to *The Candy Shop* and is based
substantially on subject matter, material, characters and incidents in *The Candy
Shop*.

64.     Plaintiff MP LLC did not consent to the publishing of *Still Candy
Shopping*.

65.     The publication of *Still Candy Shopping* by Defendants Swinson and
K.S. is in breach of MP LLC Deal 1, and has effectively impaired, frustrated, disposed
of, and detracted from the value of the rights granted to Plaintiff MP LLC by and
through MP LLC Deal 1.

66.     As a proximate result of Defendant Swinson's and Defendant K.S.'
publication of *Still Candy Shopping* in breach of MP LLC Deal 1, Plaintiff MP LLC has

12

been damaged in an amount of at least $250,000, which amount will be determined with more specificity following discovery.

## II.
## BREACH OF PUBLISHING CONTRACT
### (MP LLC Deal 2 – *Wifey 4 Life: Part 5*)

67.     Plaintiff MP LLC repeats each and every allegation contained in paragraphs 1 through 66 as if fully stated herein.

68.     On or about August 1, 2009, Plaintiff MP LLC and Defendant Swinson entered into a publishing contract ("MP LLC Deal 2", See Exhibit B).

69.     Through MP LLC Deal 2, the book's author, Defendant Swinson, exclusively licensed the copyright to *Wifey 4 Life (Part 5)* including any renewals and extension throughout the world, to Plaintiff MP LLC.

70.     Under MP LLC Deal 2, Defendant Swinson agreed to refrain from exercising or disposing of any rights that would detract from, impair or frustrate the value of any rights granted to Plaintiff MP LLC.

71.     Under MP LLC Deal 2, Defendant Swinson also agreed to refrain from publishing, or permitting to be published, any book or other writing based substantially on subject matter, material, characters or incidents in *Wifey 4 Life (Part 5)* without the written consent of the publisher.

72.     *Wifey 4 Life (Part 5)* was published by MP LLC on or about February 2010.

73.     Defendant Swinson plans to publish *Wife Extraordinaire* (a/k/a *Wifey Extraordinaire: Part 6*) on February 15, 2011, through Defendant K.S, which plan to

13

publish the said book has been facilitated by Defendant Swinson's misappropriation of Plaintiff MP LLC's business contacts.

74.     *Wife Extraordinaire* (a/k/a *Wifey Extraordinaire: Part 6*) is a sequel to *Wifey 4 Life (Part 5)* and is based substantially on subject matter, material, characters and incidents in *Wifey 4 Life (Part 5)* the use of which Plaintiff MP LLC did not consent to.

75.     Defendant Swinson's plan to publish *Wife Extraordinaire* (a/k/a *Wifey Extraordinaire: Part 6*) through Defendant K.S. is in anticipatory breach of MP LLC Deal 2, and will effectively impair, frustrate, dispose of, and detract from the value of the rights granted to Plaintiff MP LLC by and through MP LLC Deal 2.

76.     As a proximate result of Defendant Swinson's and Defendant K.S.' anticipatory breach of MP LLC Deal 2 consisting of the scheduled publication of *Wife Extraordinaire* (a/k/a *Wifey Extraordinaire: Part 6*), Plaintiff MP LLC will be damaged in an amount of at least $450,000, which amount shall be determined with more specificity following discovery.

### III.
### BREACH OF PUBLISHING CONTRACT
### (MP LLC Deal 3 – *Who's Notorious Now?* – Non-conforming Manuscript)

77.     Plaintiff MP LLC repeats each and every allegation contained in paragraphs 1 through 76 as if fully stated herein.

78.     On or about August 1, 2009, Plaintiff MP LLC and Defendant Swinson entered into a publishing contract ("MP LLC Deal 3", see Exhibit C).

79.     Through MP LLC Deal 3, the book's author, Defendant Swinson,
exclusively licensed the copyright to *Notorious Part 3 (a/k/a Who's Notorious Now?)*
including any renewals and extension throughout the world, to Plaintiff MP LLC.

80.     Under MP LLC Deal 3, Defendant Swinson also agreed to deliver an
80,000 word manuscript for the book to Plaintiff MP LLC on or before April 1, 2010,
with time being of the essence to the said agreement.

81.     On May 18, 2010, Defendant Swinson finally handed in the
manuscript for *Who's Notorious Now?* (MP LLC Deal 3) a month and a half late and
15,000 words short, all in breach of MP LLC Deal 3.

82.     After subsequent time extensions for the author, Defendant Swinson,
to make further revisions failed to produce a conforming manuscript suitable for
publishing, Plaintiff MP LLC sent a letter to Defendant Swinson accepting the
manuscript with the condition (as provided for in the contract) that publication
would be delayed until such time as a writer for hire could be contracted to revise
the manuscript for publishing.

83.     In light of the foregoing, Plaintiff MP LLC then exercised its
contractual right to reschedule the publishing of the book from November 2010 to
June 2012, which date is consistent with the terms of MP LLC Deal 3 relating to the
publication of a non-conforming manuscript.

84.     As per MP LLC Deal 3, Defendant Swinson is responsible for
indemnifying Plaintiff MP LLC for all costs resulting from her (Defendant's Swinson)
failure to submit a conforming manuscript.

15

85. As a proximate result of Defendant Swinson's failure to submit a conforming, timely manuscript in connection with MP LLC Deal 3, Plaintiff MP LLC has been harmed in that it has had to reschedule the publishing date for the book and will have to retain a writer-for-hire to revise the manuscript to make it suitable for publishing at a cost of at least $5,000.00, which cost will be determined with more specificity following discovery.

## IV.
## BREACH OF PUBLISHING CONTRACT
### (MP LLC Deal 3 – *Who's Notorious Now?* – Breach of "Next Work" Clause)

86. Plaintiff MP LLC repeats each and every allegation contained in paragraphs 1 through 85 as if fully stated herein.

87. Under MP LLC Deal 3, Defendant Swinson agreed to refrain from exercising or disposing of any rights that would detract from, impair or frustrate the value of any rights granted to Plaintiff MP LLC.

88. As a proximate result of Defendant Swinson's failure to submit a timely and conforming manuscript to Plaintiff MP LLC in connection with MP LLC Deal 3, the publication of *Who's Notorious Now?* was rescheduled from November 2010 to June 2012.

89. As per MP LLC Deal 3, *Who's Notorious Now?* was to be Defendant Swinson's next work to be published, meaning that no previously unpublished book by Defendant Swinson would be published prior to the release and publication of *Who's Notorious Now?*

16

90. On or about October 19, 2010, Defendant Swinson published *Still Candy Shopping* through Defendant K.S.

91. Upon information and belief, Defendant Swinson penned *Still Candy Shopping* during the time she was neglecting to fulfill her obligation to produce a timely and conforming manuscript for *Who's Notorious Now?* as per MP LLC Deal 3.

92. The publication of *Still Candy Shopping* by Defendant Swinson through Defendant K.S. was in breach of MP LLC Deal 3, in that it constituted Defendant Swinson's "next work", which she (Defendant Swinson) had agreed would instead be *Who's Notorious Now?* (which she failed to complete the manuscript for).

93. As a proximate result of Defendant Swinson's breach of the "next work" clause in MP LLC Deal 3, Plaintiff MP LLC has been damaged in that the delay in publication has had, and will continue to have, the effect of detracting from, impairing and/or frustrating the value of the rights granted to Plaintiff MP LLC by way of MP LLC Deal 3, which rights amount to no less than $45,000, said amount to be determined with more specificity following discovery.

**WHEREFORE**, Plaintiff Melodrama Publishing LLC respectfully demands judgment against Defendants Kiki Swinson and K.S. Publications finding both Defendants:

- (a) **AS TO COUNT I**: Jointly and severally liable to Plaintiff for all advances and profits earned by the Defendants as a result of the breach of MP LLC Deal 1, which profits and advances, upon information and belief, amount to no less than $250,000, and shall be determined with more specificity following discovery, and

- (b) **AS TO COUNT II**: Jointly and severally liable to Plaintiff for all advances and profits to be earned by the Defendants as a result of their anticipatory breach of MP LLC Deal 2, which profits, upon

17

information and belief, will amount to no less than $450,000, and shall be determined with more specificity following discovery, and

(c)   AS TO COUNT III: Jointly and severally liable to Plaintiff for all costs and expenses incurred by Plaintiff in connection with revising the non-confirming manuscript to make the same suitable for publishing, which costs and expenses amount to at least $5,000 and shall be determined with more specificity following discovery, and

(d)   AS TO COUNT IV: Jointly and severally liable to Plaintiff for all advances and profits earned by the Defendants as a result of the breach of MP LLC Deal 3, which profits and advances, upon information and belief, amount to no less than $45,000, which amount shall be determined with more specificity following discovery, and

(e)   AS TO ALL COUNTS: Jointly and severally liable for all costs and attorneys' fees incurred by Plaintiff in connection with initiating and maintaining this action, as well as any and all other further relief this court deems just and proper.

Dated:   New York, New York
         November 22, 2010

Respectfully submitted,

Carl E. Person
*Attorney for the Plaintiff*
325 W. 45th Street - Suite 201
New York, New York 10036-3803
Tel:  (212) 307-4444
Fax:  (212) 307-0247
email:  carlpers2@gmail.com

## VERIFICATION

Carl E. Person, an attorney admitted to practice before the Courts of this State, hereby affirms under the penalties of perjury, pursuant to CPLR 2106, that the following is true and correct:

That I have read the foregoing Verified Complaint (the "Complaint") and know the contents thereof; that the same is true to the best of my knowledge and belief, except as to the matters therein stated to be alleged upon information and belief, and as to these matters I believe them to be true. I further state that the grounds of my knowledge and belief as to all matters in the Complaint are based upon a review of relevant documents and conversations with the Plaintiff principal.

That the reason this verification is made by me instead of any of the Plaintiff is that the Plaintiff do not reside or have an office for the conduct of business within the County of New York, which is the County where I have my office.

Dated:      New York, New York
            November 22, 2010

                                        Carl E. Person

# EXHIBIT A

MELODRAMA PUBLISHING, LLC
P.O. BOX 522
BELLPORT, NY 11713-0522
(646) 879-6315

AGREEMENT dated June 20, 2006 between Melodrama Publishing, LLC (the "Publisher")
P.O.BOX 522, BELLPORT, NEW YORK 11713-0522, and Ki Ki Swinson (the "Author") of 618
ZEPHYR COURT, VIRGINIA BEACH, VIRGINIA 23462.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with
respect to a novel entitled THE CANDY SHOP (the "Work") to be published by Melodrama
Publishing.

## 1. Rights Granted

### The Grant and the Territory

1.  Author grants publisher during the full term of copyright and any renewal or extensions
    thereof the exclusive right to publish the Work including the right to exercise or license
    the rights set forth in Paragraph 2 throughout the world in the English language and all
    other languages.

    (A) During the term hereof, The Author shall not publish in his name or pseudonym, or
    cause to permit to be published, any book on the same or similar subject matter as the
    Work that would conflict with or lessen its' sale.

### Subsidiary Rights

2.  (A) The publisher shall have the right, in the territories set forth in Paragraph 1, to
    exercise the following rights in the Work or to license such rights upon terms as
    Publisher deems advisable: book club rights; anthology/permission rights; second serial
    rights (i.e. publication after first publication in book form); abridgment/condensation and
    digest rights calendar rights; large print rights; reprint and special edition rights;
    electronic text rights and electronic adaptation rights as defined in Paragraph 34(a); audio
    rights as defined in Paragraph 34(b); first serial rights (i.e., publication before first
    publication in book form); British Commonwealth rights; foreign language rights; and
    theme park rights as defined in Paragraph 34 (c).

    (B) Any grant of first or second serial rights shall specifically prohibit the licensee from
    reproducing all or a substantial portion of the Work.

    (C) Publishing may license others free of charge to publish the Work in Braille or other
    forms of handicapped.

    (D) Publisher may authorize copyright and permissions clearance organizations to act in
    full or in part on its behalf and Publisher shall account to the Author for royalties
    received from such organizations designated as arising from reproduction of the Work.

1

(E) The party who controls motion picture. dramatic and television rights is authorized to publish and to license others to publish. in any form, excerpts, summaries and serializations, none to exceed 7, 500 words in length. of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all steps necessary to protect the copyright in the Work.

(F) The Publisher shall notify the Author promptly after each disposition of rights. but inadvertent failure to do so will not be deemed a breach of this agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work of the Author's request therefor.

(G) Publisher shall have the right to license the rights set forth in subparagraph (a) above to Publisher's parent. subsidiaries. affiliates and divisions, provided that the terms for such license are no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

Option

3.      (A) The author grants the Publisher an exclusive option to acquire the Author's next (i.e.. written work after the Work) full length work of fiction for publication on mutually satisfactory terms. If. within 60 days following submission of a reasonably detailed outline of such work to the Publisher, or within 60 days after publication of Work. whichever shall be later. Publisher and Author are unable in good faith to agree upon terms for publication. the Author shall be free thereafter to submit such next work to other publishers, provided, however, that the publisher shall retain the first option to acquire the work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall submit such next work to other publishers. nor seek offers from or negotiate with others with respect thereto.

## II. Manuscript Delivery

Delivery of the Manuscript, Related Materials and Permissions

4.      (A) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of the Work in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before October 1, 2006. The Work shall be approximately 65,000 words in length. The Author shall also deliver diskettes or other electronic format specified by Publisher containing the Work.

(B) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs. drawings. charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's opinion for publication of the Work, all in content and form satisfactory to Publisher. If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall deduct the cost thereof from any advances payable to the Author under this Agreement or. at Publisher's option, charge such cost against the Author's royalty account.

2

(C) If permission from others is required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(D) If the Author fails to deliver the related materials or required permissions, Publisher shall have the right, but not obligation, to obtain the same and in such event the cost of such preparation shall be borne by the Author as follows: (i) Author shall pay such cost upon receipt of an invoice from Publisher: (ii) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher.

## III. Payments to the Author

### Advance

1.      Publisher shall pay Author, as an advance against all amounts accruing to Author under this Agreement, the sum of $5000.00, payable as follows:

$5000.00 on Publisher's first publication of Work.

### Royalties

5.      The Publisher shall pay the Author royalties on all copies of Work sold by the Publisher, less returns as follows:

(A) if published as a trade paperback edition, 10% of the catalog retail price on all copies sold, subject to the exceptions set forth below;

(B) if published as a mass-market edition, 6% of the retail price on the first 150,000 copies sold, and 6½ % of the suggested catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(C) if published as an electronic text (e-book) edition, 10% of the catalog retail price on all copies sold, except that on special discount sales (as defined in Paragraph 34(e)), the royalty shall be 12% of the net amount actually received from such sales;

(D) if published as an audio edition, 7% of the catalog retail price on the first 10,000 copies sold, 7¼ of the catalog retail price on the next 10,000 copies sold, and 7½ of the catalog retail price on all copies sold thereafter, subject to the exceptions set forth below;

(E) If published as a large print edition, 12% of the net amount actually received from the such sales, subject to the exceptions set forth below;

(F) If published as a low-cost hardcover edition, 12% of the net amount actually received from such sales, subject to the exceptions set forth below;

3

(G) If published as a calendar based upon the Work, 12% of the net amount actually received from such sales, subject to the exceptions set forth below;

(H) On copies of the trade paperback editions sold for export to third parties or outside the United States by the Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print and low-cost hardcover editions sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be 7% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales:

(I) on Publisher's exercise of commercial or merchandising rights, the parties shall negotiate in good faith to establish a royalty rate:

(J) on mail order sales and other direct response sales, the royalty shall be 7% of the net amount actually received from such sales, except that on mail order sales and other direct response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(K) on special discount sales (as defined in Paragraph 34(e)), the royalty shall be 7% of the net amount actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(L) on copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 7% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(M) on remainder-in-place sales (as defined in Paragraph 34(f)) and remainder sales, the royalty shall be 7% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales, except that no royalty shall be payable on copies of the Work sold at discount of 85% or more from the catalog retail price:

(N) On any revised edition of the Work, royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Author revise any edition of the Work and are entitled to royalties on such edition, then Author shall receive royalties on such edition at rates to be negotiated in good faith.

## EDITING AND PROOFS

6.     The Author for his part shall work with an editor approved by the Publisher or member of the publishing house and make all necessary changes to the manuscript and submit to the Publisher for approval. The Publisher shall review the edited manuscript.

4

Proceeds on License of Subsidiary Rights

7.    The Publisher shall pay the Author 25% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| First serial rights (i.e., publication Before first publication in book form | 50% | 50% |
| British Commonwealth right for all Editions of the Work except the audio Edition | 50% | 50% |
| Foreign language rights | 50% | 50% |
| Theme park rights as defined in Paragraph 34(c) | 50% | 50% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

Special Royalty Provisions

8.    With respect to each of the Work published hereunder, the following shall be applicable:

(A) No royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, sample or similar purposes;

(B) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(C) In some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(D) When the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however,

5

that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(E) any advance royalties or other sums paid to or on behalf of the Author under this Agreement, and any amounts due from the Author to the Publisher, may be applied in reduction of any amounts payable to the Author under this Agreement;

(F) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher;

(G) Any amounts payable to the Author hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion;

(H) If the Publisher exercises rights for which royalties are not specially set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher.

### Royalty Statements

9.   (A) Publisher shall render royalty statements and make accounting and royalty and other payments to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

   (B) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period.

   (C) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within two years after the date the statement was rendered.

### Examination of Publisher's Books and Records

10.   The Author or the Author's representative may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of two years immediately preceding such examination. Such examination shall be on Publisher's premise at a time convenient to Publisher, but no later than 90 days after Author's request thereof, and shall be at Author's expense.

6

### IV. Failure to Deliver the Manuscript; Acceptance of the Manuscript

Failure to Deliver the Manuscript

11.   Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of the Work, satisfactory to the Publisher in length, content and form, within the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement, and in such event the Publisher may then recover and the Author shall repay on demand all amounts advanced to the Author. In the event that the Author completes a manuscript for the Work after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire the Work on same terms and conditions as provided in this Agreement.

Extension of Time to Deliver

12.   Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

Acceptance of Manuscript

13.   (A) The Publisher shall not be obligated to accept or publish Work if in its sole judgment the Work is not acceptable to it. If the Author delivers a manuscript of the Work within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within 90 days after its receipt thereof, determine whether the Work is acceptable to it. In lieu thereof, Publisher may request in writing that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as possible after Publisher's request therefor. No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject the Work shall be extended to 30 days after completion of the legal review.

(B) Acceptance of the manuscript shall be made by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall constitute written notice of acceptance unless such payment is accompanied by a notice to the contrary.

(C) If the Publisher fails to accept the complete manuscript or revised complete manuscript within the time periods provided in subparagraph (a) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate in accordance with the provisions of subparagraph (d) below.

(D) If the complete manuscript or revised complete manuscript delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Author shall repay all sums advanced to the Author hereunder and upon such repayment this Agreement shall terminate.

(E) In the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell the Work elsewhere, and the Author shall be obligated to repay all sums advanced hereunder; but for period of 18 months after termination of this Agreement such obligation shall be limited to repayment from (i) the first (and all) proceeds of any contracts with others concerning the Work or any rights thereto, including, without limitation, rights listed in Paragraph 2 above, and (ii) any payments due Author from Publisher for any reason. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author from other persons or entities as a result of Author's rights with respect to the Work, and Author's hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph. At the end of the 18-month period any sums that have not been repaid or recovered from other sums due to the Author shall become immediately due and payable to the Publisher.

## V. Production and Publication of the Work

### Correction of Proofs

14.  Publisher shall furnish Author with one set of galleys or other first proofs, and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs–provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for another 21-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

### Cost of Author's Alterations

15.  If, in the correction of proofs, the Author requests changes from the text of the manuscript, the Author shall bear the cost of such changes, over 15% of the original cost

8

of composition, as follows: (a) Author shall pay such costs upon receipt of an invoice from Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option. Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then the Author will reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

### Publication

16.     (A) The Publisher shall publish the Work in book form within 6 months after acceptance of the manuscript therefor. Publication shall be in any edition and under any imprint of Publisher or its affiliates that Publisher elects.

(B) Publisher shall have the right to use the name, pseudonym, portrait and picture of and biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(C) The title of the Work as set forth on page 1 may be changed by mutual agreement of the Author and the Publisher.

(D) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution and promotion of the Work shall be determined at the sole discretion of the Publisher.

(E) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If the compensation is received it shall be shared equally by Author and Publisher.

(F) Author hereby consents to Publisher's advertising inside the front and back covers and/or in the last four pages of Publisher's editions, books in print or Author or others, and any other publishing-related advertisement associated with Publisher or with any other of Publisher's parent, subsidiaries, affiliates or divisions. No other advertising will be printed in, included in (bound or unbound), distributed with or inserted into any copies of Publisher's editions of the Work without Author's prior written consent.

### Copyright

17.     (A) The Publisher shall identify the Author as the owner of the copyright in the Work and may register such copyright in the United States in the name of the Author.

(B) The Publisher shall identify the Author as the owner of the ©copyright in the audio edition of the Work. The Publisher shall be identified as the owner of the (P) copyright in the audio edition of the Work. Author hereby assigns, and Publisher shall own, all right, title and interest in and to the audio edition of the Work and all additions to,

9

alterations of or revisions of the audio edition, and all drafts, notes, scripts, voice recordings and musical recordings related thereto.

(C) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention.

(D) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgment accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work. Author and Publisher by name.

(E) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(F) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder.

#### No Obligation to Publish

18.  Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish Work if, in the sole and absolute judgment of its legal counsel, whether before or after or after acceptance thereof, the Work contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity. In such event, Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder, and to terminate this Agreement. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel.

#### Delays in Publication

19.  (A) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of the Work beyond the time set forth in Paragraph 16(a) for a reasonable time. If publication of the Work is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish the Work within 180 days after the date of such notice, then all of the Publisher's rights in and to the Work shall terminate at the end of such 180-day period; and if, in such event, the Publisher shall fail to publish the Work within such 180-day period, all of the Publisher's rights in and to the Work shall

10

terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement.

(B) If publication is delayed beyond the time set forth in Paragraph 16(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date six months following removal of the cause of the delay.

## Out of Print Termination

20.   If, at any time after the expiration of two years form the publication date, the Publisher allows all of its editions of the Work to go out of print and such status continues in effect for six months after the Author has given Publisher written notice ("Reversion Notice") to put the Work back into print, and if there is no English language or foreign language reprint edition authorized by Publisher available or contracted for within such six-month period, then the Author may by a notice in writing terminate this Agreement subject to any licenses previously granted by notice Publisher (and any renewals or extensions thereof) and Publisher's right to continue to share in the proceeds therefrom. In the event of such termination the Author shall have the right to purchase any available plates or film of the Work at cost, and/or any remaining copies or sheets of the Work at cost. If the Author does not purchase such plates, film, copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale. The Publisher is under no obligation to retain any such plates, film, copies or sheets. The Work shall not be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions.

### VI.   Other Rights, Undertakings and Obligations

## Author's Rights

21.   All rights not expressly granted by the Author to the Publisher are reserved to the Author. The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted herein to the Publisher, nor shall the Author publish or permit to be published during the term of this Agreement any book or other writing based substantially on subject matter, material, characters or incidents in the Work without the written consent of the Publisher.

## Payee

22.   Publisher is hereby directed to pay all sums due to the Author under the terms of this Agreement, directly to the Author at the address set forth on page 1 of this Agreement.

## Representation by Single Author and Author's Warranties

23.   Author warrants and represents that:

(A) Author is the sole author and proprietor of the Work

11

24.   Author has full power and authority to make this Agreement and to grant the rights
      granted herein, and Author has not previously assigned, transferred or otherwise
      encumbered the same; and Author has no prior agreement, commitment or other
      arrangement, oral or written, to write or participate in writing any other book-length work
      and will enter into no such agreement, commitment or other arrangement until after
      delivery and acceptance of the Work;

      (B) The Work has not been previously published;

      (C) The Work is not in the public domain:

      (D) The Work does not infringe any statutory or common law copyright or any
      proprietary right of any third party;

      (E) the Work does not invade the right of privacy of any third person, or contain any
      matter libelous or otherwise in contravention of the rights of any third person; and, if the
      Work is not a work of fiction, all statements in the Work asserted as facts are true or
      based upon reasonable research for accuracy;

      (F) The Work is not obscene and contains no matter the publication or sale whereof
      otherwise violates any federal or state statute or regulation thereunder, nor is it in any
      other manner unlawful, and nothing contained in the Work shall be injurious to the health
      of the user;

      (G) the Work will be Author's next work (whether under Author's name or otherwise),
      and that Author will not publish or authorize publication of any other full-length work of
      which Author is an author or co-author until six months after publication of the Work.

      Each of the foregoing warranties and representations shall survive the termination of this
      Agreement.

      Each of the foregoing warranties and representations is true on the date of the execution
      of this Agreement and shall be true on the date of publication of the Work, and at all
      intervening times. The Publisher may rely on the truth of said warranties and
      representations in dealing with any third party in connection with the exercise or
      disposition of any rights in the Work. The Publisher shall be under no obligation to make
      an independent investigation to determine whether the foregoing warranties and
      representations are true and correct; and any independent investigation by or for the
      Publisher, or its failure to investigate, shall not constitute a defense to the Author in any
      action based upon a breach of any of the foregoing warranties.

#### Indemnity

25.   (A) The Author shall indemnify and hold the Publisher harmless against any loss,
      liability, damage, cost or expense (including reasonable attorney's fees) arising out of or
      for the purpose of avoiding any suit, proceeding, claim or demand or the settlement
      thereof, which may be brought or made against the Publisher by reason of the
      publication, sale, or distribution of, or disposition of rights in respect to the Work, based
      on the contents of the Work, except in connection with matters involving solely
      controversies arising out of or based on commercial transactions between the Publisher
      and its customers.

(B) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(C) Whenever any suit, claim or demand as to which Author's indemnity applies is brought or made against the Publisher, the Publisher may withhold payments due to the Author under this Agreement, or any other agreement between the Author and the Publisher, and apply the payments so withheld to Author's indemnity obligations hereunder.

## Revised Editions

26. The Author shall revise the first and subsequent editions of the Work at the request of the Publisher and supply any new matter necessary from time to time to keep the Work up to date. If Author shall neglect, be incapable, be unwilling or, in Publisher's judgment will not be able to revise or supply new matter at a time and in a form satisfactory to Publisher, then Publisher shall have the right to engage some other person(s) to do so. When such revisions are not made by the Author, Publisher may cause such fact to be evidenced in the revised edition. Publisher shall have all rights in revised editions of the Work which Publisher has in the original edition of the Work.

## Tie-in Editions

27. Author shall use best efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in Publisher's editions of the Work.

## Care of Property

28. Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

## Breach by Publisher

29. Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of the Agreement and shall fail to remedy the breach within 60 days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time, but in such event the Publisher shall be permitted to sell all copies of those editions of the Work which have already been printed or are in the process of being printed; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such plates, film, copies or sheets, the Publisher may dispose of them at any

13

price and retain the proceeds of such sale. The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

#### Free Copies for Author. Purchases by Author

30. (A) The Publisher shall present the Author with 100 free copies of each edition of the Work published by the Publisher, upon publication. The Author shall have the right to purchase additional copies for Author's own use, and not for resale. at a 40% discount from the catalog retail price. If the Author wishes to purchase copies of Work for resale. Author shall negotiate the terms of such purchase with Publisher's Special Sales Department, it being understood that any resale of the Work by Author shall be outside regular trade channels.

#### Publisher's Trademarks

31. Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher. nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased.

#### Third Party Copyright Infringement

32. If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense. take such legal action, in the Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher.

#### Execution of Documents

33. Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

### VII. Definitions

#### Definitions

34. As used in this Agreement:
    (A)  (i) "Electronic test rights" shall mean the exclusive right to publish, and to authorize others to publish, the text of the Work (including any photographs and illustrations in the Work) in whole or in part, in visual form for reading, by any electronic, electromagnetic or other means of storage, retrieval. devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual,

14

visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without approval of the Author, such approval not unreasonably to be withheld delayed. Any license of electronic text rights of the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the approval of the Author, such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the text of the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights).

(B) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights;

(C) "Theme park rights" shall mean the exclusive right to use all or any portion of the Work in and in connection with amusement/tour/theme parks. Such rights shall include, without limitation, the right to (i) create, present, stage and/or perform any attraction, presentation, show and/or ride based upon and/or derived from the Work; (ii) use "walk-around" performances by attraction, presentation, show and/or rider; and (vi) use any of the foregoing to advertise, exploit and/or promote any such amusement/tour/theme park.

(D) A "sale," "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

(E) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 60% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 65% from the catalog retail price. With respect to special discount sales to organizations, Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(F) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

## VIII. Miscellaneous Provisions

### Assignment

35.     This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgment of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. Any purported assignment in violation of this provision shall be void.

### Effectiveness

36.     This Agreement shall be binding upon the Publisher only when it has been signed by the Author and by an authorized officer of the Publisher.

### Jurisdiction

37.     Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York. to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested. or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business. The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

### Notices

38.     All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses as they are given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent.

### Applicable Law

16

39.   THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY
THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS
MADE AND ENTIRELY TO BE PERFORMED THEREIN.

Waivers

40.   No waiver of any term or condition of this Agreement, or of any breach of this
Agreement or of any part thereof, shall be deemed a waiver of any other term or
condition of this Agreement or of any later breach of this Agreement or of any part
thereof, nor shall publication or continued publication or payment by the Publisher
following notice or claim of facts which, if true, would constitute a breach of warranty,
representation or agreement of the Author, constitute or imply any waiver by the
Publisher of any defenses, rights or remedies of the Publisher. No failure by either party
to assert any right under this Agreement shall preclude any later assertion of such right.

Validity and Enforceability

41.   The invalidity or unenforceability of any provision of this Agreement shall not affect the
validity or enforceability of any other provisions hereof. and any such invalid or
unenforceable provision shall be deemed to be severable.

Singular Shall Include Plural

42.   Wherever required by the context in this Agreement, the singular shall include the plural.
and the term "Author" shall include the "Authors" if there are more than one.

Entire Agreement

43.   This Agreement constitutes the entire understanding of the parties concerning the subject
matter hereof. and may not be modified except by an instrument in writing signed by the
party to be charged.

Captions

44.   Captions are for convenience only. and are not to be deemed part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first
set forth above.

AUTHOR                                              MELODRAMA PUBLISHING, LLC


Ki Ki Swinson        7/11/06                        Crystal Winslow

Soc. Sec.#: _   REDACTED                            Publisher
                                                    Crystal Winslow
                                                    Melodrama Publishing, LLC

Citizenship: __US__

Resident of: Virginia Beach, VA

# EXHIBIT B

MELODRAMA PUBLISHING, LLC
P.O. BOX 522
BELLPORT, NY 11713-0522

AGREEMENT made the 1st of August, 2009 between Melodrama Publishing, LLC (the "Publisher") P.O.BOX 522, BELLPORT, NEW YORK 11713-0522, and Kiki Swinson (the "Author") of 618 Zephyr Court, Virginia Beach, VA 23462.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to a novel tentatively entitled Wifey Part 5 (the "Work") to be published by Melodrama Publishing.

## I. Rights Granted

### The Grant and the Territory

1.   (A) The Author grants publisher during the full term of copyright and any renewal or extensions thereof the exclusive right to publish the Work in all print, digital, and audio formats and media, including the right to exercise or license the rights set forth in Paragraph 2 throughout the world (the "Exclusive Territory") in the English language and all other languages.

(B) The Author agrees that, while the Work is in print, he or she will not, without the written permission of the Publisher, publish or cause to be published any material based on material in the work which, in the Publisher's reasonable judgment, is likely to compete with the sale of the work or diminish the value of any subsidiary rights granted by this Agreement, except that the Author may grant licenses for the exploitation of any right reserved to the Author under this Agreement.

### Subsidiary Rights

2.   (A) The publisher shall have the exclusive right in the Exclusive Territory, and the non-exclusive right in any other territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon terms as Publisher deems advisable: book club rights; anthology/permission rights; first serial rights (i.e. publication before first publication in book form); second serial rights (i.e. publication after first publication in book form); abridgment, condensation and digest rights; calendar rights; large print rights; reprint and special edition rights; electronic text rights and electronic adaptation rights as defined in Paragraph 34(A); audio rights as defined in Paragraph 34(B); British Commonwealth rights; foreign language rights; and theme park rights as defined in Paragraph 34 (C).

(B) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work.

(C) Publisher may license others without compensation to Publisher or Author to publish the Work in Braille or other forms for the handicapped.

(D) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

1

(E) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7, 500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all commercially reasonable steps to protect the copyright in the Work.

(F) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work of the Author's request therefor.

(G) Publisher shall have the right to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(H) If Publisher itself exercises any rights for which no royalty rate is set forth below, Publisher and Author shall negotiate and agree upon a mutually acceptable royalty.

#### Option

3.      The Author grants the Publisher an exclusive option to acquire the Author's next (i.e., written work after the Work) full length work of fiction for publication on mutually satisfactory terms. If, within 60 days following submission of a reasonably detailed outline of such work to the Publisher, or within 60 days after publication of Work, whichever shall be later, Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to submit such next work to other publishers, provided, however, that the publisher shall retain the first option to acquire the work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

#### II. Manuscript Delivery

##### Delivery of the Manuscript, Related Materials and Permissions

4.      (A) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of the Work in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before October 1, 2009.  The Work shall be approximately 80,000 words in length.  The Author shall also deliver diskettes or other electronic format specified by Publisher containing the Work.

(B) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's opinion for publication of the Work, all in content and form satisfactory to Publisher.  If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall deduct the cost thereof from any advances payable to

2

the Author under this Agreement or, at Publisher's option, charge such cost against the Author's royalty account.

(C) If permission from others is required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement, Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of and together with the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(D) If the Author fails to deliver the related materials or required permissions, Publisher shall have the right, but not obligation, to obtain the same and in such event the cost of such preparation shall be borne by the Author as follows: (i) Author shall immediately pay such cost upon receipt of an invoice from Publisher; (ii) Publisher may deduct such cost from any advances and/or royalties otherwise payable to the Author under this Agreement, provided however that if Publisher seeks to deduct such cost from earned royalties, and if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then Author will immediately reimburse Publisher for such cost upon receipt of an invoice from Publisher.

(E) If the complete manuscript of the Work is timely delivered but is not satisfactory to the Publisher, the Publisher may (but shall have no obligation to) notify the Author in writing giving the Author thirty (30) days to make satisfactory revisions. If the Publisher does so, and if at the end of the thirty (30) day extension, the manuscript is still unsatisfactory, the Publisher shall have the right, but not obligation, to obtain the services of a writer for hire to revise the Work and in such event the cost of such preparation shall be borne by the Author as follows: (i) Author shall immediately pay such cost upon receipt of an invoice from Publisher; or (ii) Publisher may withhold payment of advances, royalties and/or subsidiary rights income otherwise due to Author under this Agreement and deduct costs therefrom until the debt is satisfied, provided however that if payments otherwise due to Author under this Agreement are inadequate for recoupment of such costs one year after publication of the Work, then Author will immediately reimburse Publisher for such costs upon receipt of an invoice from Publisher.

## III. Book Manufacturing

Costs:

(A)   Author agrees that prior to printing costs that she is responsible for the Publishers expenses deriving from Work, including but not limited to model and cover design. Failure to pay by Author of said cost will be considered a lien from future income from said Work until debt is reconciled.

(B)   Author agrees that if there is a dispute regarding publication and/or distribution of said Work between Publisher and Author then no Work will be printed, distributed or marketed until said dispute is resolved legally or in writing between Publisher and Author.

(C)   Author shall pay all amounts accruing for trade publication of Work including but not limited to book manufacturing as defined in Paragraph 34 (H), freight shipping as defined in Paragraph 34 (I), inside book layout as defined in Paragraph 34 (J), and editorial costs as defined in Paragraph 34 (K) under this Agreement.

(D)   Author and Publisher agree that first printing cost as described in Paragraph 34 (H) will be 10,000 units and will not exceed 10,000 units.

3

(E)     Author agrees that she will not request an advance on copies sold from the Work to facilitate printing costs or for any other unforeseeable reason(s).

(F)     Author agrees:
        (1) Author royalty rate immediately reverts back to 10% off retail price on all trade publication after the first 10,000 copies are sold.
        (2) Any and all printing rights will be determined by Publisher.
        (3) After the first 10,000 copies are printed and sold, the right to pay for trade publication printing transfers to Publisher and that right remains transferred indefinitely.

(G)     Publisher shall pay all amounts to ensure delivery to Melodrama's warehouse, any and all book chains and distribution centers. Melodrama's warehouse fees, ISBN, and bar code for Melodrama Publishing.

(H)     Publisher reserves the right to choose recognized shipping companies including but not limited to UPS. FedEx, or DSL for shipping purposes under this Agreement.

(I)     Publisher reserves the right to hire and/or subcontract out for purposes of said Work and Author agrees to abide by Publishers decision in any and all matters pertaining to this Agreement.

(J)     Publisher and Author both agree that the terms and conditions under this Agreement are limited to this Work only and the only modification from previous Works with Publisher and Author are the Author's royalty rate on trade publication for 10,000 copies as outlined below in Royalties 5 (A) and (B).

## Royalties

5.  Publisher and Author agree that the terms and conditions of the royalty rate defined below only pertain to trade paperback publication as set forth above in III Book Manufacturing costs. The Publisher shall pay the Author royalties on all copies of the Work (subject in each case to the exception set forth above and below). less returns as follows:

    (A) If published as a trade paperback edition, 60% of the wholesale price on the first 10,000 copies sold, subject to the exceptions set forth above in III Book Manufacturing Costs.

    (B) Author agrees that the royalty rate immediately reverts back to 10% off the retail price after the first 10,000 copies are sold as set forth above in III Book Manufacturing Costs on trade paperback.

    (C) If published as a mass-market edition, 8% of the retail price on the first 100,000 copies sold, and 10% of the suggested catalog retail price on all copies sold thereafter;

    (D) If published as an electronic text (e-book) edition, twenty-five percent (25%) of the amounts received by the Publisher, excluding taxes and invoiced shipping and handling charges, if any.

    (E) If published as an audio edition, 7% of the catalog retail price on the first 10,000 copies sold, 7¼ of the catalog retail price on the next 10,000 copies sold, and 7½ of the catalog retail price on all copies sold thereafter;

    (F) If published as a large print edition, 15% of the net amount actually received from the sales;

    (G) If published as a low-cost hardcover edition, 15% of the net amount actually received from such sales;

4

(H) If published as a calendar based upon the Work, 15% of the net amount actually received from such sales;

#### Exceptions:

(I) On copies of the trade paperback editions sold to third parties for export or outside the United States by the Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print and low-cost hardcover editions sold to third parties for export or outside the United States by Publisher or its affiliates, the royalty shall be 7% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(J) on mail order sales and other direct response sales, the royalty shall be 7% of the net amount actually received from such sales, except that on mail order sales and other direct response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(K) on high discount sales (as defined in Paragraph 34 (E)) of Publisher's paperback editions, the royalty shall be 10% of the net amount Publisher actually received from such sales; if such copies are sold on a non-returnable basis, no reserve against returns shall be held on account of such non-returnable copies.

(L) on special discount sales (as defined in Paragraph 34(F)) of Publisher's paperback editions, the royalty shall be 7% of the net amount Publisher actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(M) On all copies sold through special arrangements with book clubs, the royalty shall be ½ the prevailing royalty rate. On copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 7% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(N) on remainder-in-place sales (as defined in Paragraph 34(G)) and remainder sales, the royalty shall be 7% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales, except that no royalty shall be payable on copies of the Work sold at discount of 85% or more from the catalog retail price;

(O) limited reprint: with respect to copies of regular hardcover editions of the Work sold by the Publisher in the United States from any reprinting by the Publisher of two thousand five hundred (2,500) copies or less made at least two (2) years after the date of initial publication of the Work, a royalty at a rate equal to three-fourths (3/4) of the rate which would otherwise apply under this paragraph 6. The same three-quarters (3/4) royalty shall be payable on reprints of fifteen hundred (1,500) copies or less regardless of when made; These reductions in royalty will enable the Publisher to keep the Work in print as long as possible.

5

(P) On any revised edition of the Work. royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Author revise any edition of the Work and are entitled to royalties on such edition, then Author shall receive royalties on such edition at rates to be negotiated in good faith.

(Q) on Publisher's exercise of commercial or merchandising rights, the parties shall negotiate in good faith to establish a royalty rate.

Proceeds on License of Subsidiary Rights

7. The Publisher shall pay the Author 25% of the proceeds received by Publisher from the sale or license of subsidiary rights. except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| First serial rights (i.e., publication Before first publication in book form | 50% | 50% |
| British Commonwealth right for all Editions of the Work except the audio Edition | 50% | 50% |
| Foreign language rights | 50% | 50% |
| Theme park rights as defined in Paragraph 34(C) | 50% | 50% |
| Commercial and Merchandising (derivative products such as the use of a title or character for clothing or toys) | 50% | 50% |
| Performance (television, radio, dramatic, musical, motion picture and video rights and allied merchandising rights derived therefrom). | 50% | 50% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

Special Royalty Provisions

8. With respect to each edition of the Work published hereunder, the following shall be applicable:

(A) No royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity. promotion, Author's promotion, Author's free copies, sample or similar purposes, or sold below or at cost including expenses incurred, or sold to the Author for Author's personal use or resale;

6

(B) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

(C) In some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(D) When the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(E) any advance royalties or other sums paid to or on behalf of the Author under this Agreement, and any amounts otherwise due from the Author to the Publisher, may be applied in reduction of any amounts otherwise payable to the Author under this Agreement:

(F) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher;
(G) Any royalties payable to the Author hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion:

(H) If the Publisher exercises rights for which royalties are not specially set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher.

## Royalty Statements

9. (A) Publisher shall render royalty statements and make payments of sums due thereon to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(B) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period.

7

(C) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within two years after the date the statement was rendered.

## Examination of Publisher's Books and Records

10. The Author or the Author's certified public accountant may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of two years immediately preceding such examination. Such examination shall be on Publisher's premises during normal business hours at a time convenient to Publisher, but no later than 90 days after Author's request thereof, and shall be at Author's expense. Such examination shall last no longer than five (5) business days.

## IV. Failure to Deliver the Manuscript; Acceptance of the Manuscript

### Failure to Deliver the Manuscript

11. Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of the Work, satisfactory to the Publisher in length and form, within the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement, and in such event the Publisher may then recover and the Author shall repay on demand all amounts advanced to the Author, and any monies spent by Publisher on behalf of said Work, including but not limited to the cover, promotions and web site promotions. In the event that the Author completes a manuscript for the Work after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire the Work on the same terms and conditions as provided in this Agreement. The Author shall not submit the said manuscript to any agent or any other publisher until and unless the Publisher declines to acquire such manuscript.

### Extension of Time to Deliver

12. Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

### Acceptance of Manuscript

13. (A) The Publisher shall not be obligated to accept or publish Work if in its sole judgment the Work is not acceptable to it. If the Author delivers a manuscript of the Work within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within 90 days after its receipt thereof, determine whether the Work is acceptable to it. Publisher may elect to request in writing that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised, Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as possible after

8

Publisher's request therefor (and in no event shall Publisher be required to wait more than 60 days to receive such revisions). No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If the Publisher in its sole discretion determines to submit the manuscript to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject the Work shall be extended to 30 days after completion of the legal review.

(B) Acceptance of the manuscript shall be made only by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall not constitute written notice of acceptance unless such payment is accompanied by a written notice of acceptance. Acceptance of or payment for a portion of the manuscript shall not obligate Publisher to accept or pay for the entire manuscript.

(C) If the Publisher fails to accept the complete manuscript or revised complete manuscript within the time periods provided in subparagraph (A) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate in accordance with the provisions of subparagraph (D) below.

(D) If the complete manuscript or revised complete manuscript delivered by the Author is not, in Publisher's sole judgment, acceptable to the Publisher, the Publisher shall so notify the Author, and the Author shall promptly repay all sums advanced to the Author hereunder and upon such repayment this Agreement shall terminate.

(E) In the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell the Work elsewhere, and the Author shall be obligated to repay all sums advanced hereunder; but for a period of 18 months after termination of this Agreement such obligation shall be limited to repayment from (i) the first (and all) proceeds of any contracts with others concerning the Work or any rights thereto, including, without limitation, rights listed in Paragraphs 1 and 2 above, and (ii) any payments due Author from Publisher for any reason. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author from other persons or entities as a result of Author's rights with respect to the Work, and Author's hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph. At the end of the 18-month period any sums that have not been repaid or recovered from other sums due to the Author shall become immediately due and payable to the Publisher.

### Editing

14.   The Author shall work with an editor approved by the Publisher or employee of Publisher and make all necessary changes to the manuscript and submit the edited manuscript to the Publisher for approval. The Publisher shall review the edited manuscript.

### V. Production and Publication of the Work

9

## Correction of Proofs

15. Publisher shall furnish Author with one set of galleys or other first proofs, and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs–provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for a single additional 14-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

## Cost of Author's Alterations

16. If, in the correction of proofs, the Author requests changes from the text of the accepted manuscript, the Author shall bear the cost of such changes, over 15% of the original cost of composition, as follows: (a) Author shall immediately pay such costs upon receipt of an invoice from Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then the Author will immediately reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

## Publication

17. (A) The Publisher shall publish the Work in book form within 24 months after acceptance of the manuscript therefor. Publication shall be in any edition, any format, and under any imprint of Publisher or its affiliates that Publisher elects.

(B) Publisher shall have the right to use the name, pseudonym, portrait and picture of and biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder, Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(C) The title of the Work as set forth on page 1 may be changed by mutual agreement of the Author and the Publisher.

(D) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution, advertising and promotion of the Work shall be determined at the sole discretion of the Publisher.

(E) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If the compensation is received it shall be shared equally by Author and Publisher.

(F) Author hereby consents to Publisher's advertising inside the front and back covers and/or in the last four pages of Publisher's editions, books in print of Author or others, and any other publishing-related advertisement associated with Publisher or with any other of Publisher's parent, subsidiaries, affiliates or divisions. No other advertising will be printed in, included in (bound or unbound), distributed with or inserted into any copies of Publisher's editions of the Work without Author's prior written consent.

#### Copyright

18.    (A) The Publisher shall identify the Author as the owner of the copyright in the Work and may register such copyright in the United States in the name of the Author.

(B) The Publisher shall identify the Author as the owner of the © copyright in any audio edition(s) of the Work.   The Publisher shall be identified as the owner of the (©) copyright in any audio edition(s) of the Work.  Author hereby assigns, and Publisher shall own, all right, title and interest in and to all additions to, alterations of or revisions of Work for the audio edition(s), and all drafts, notes, scripts, voice recordings and musical recordings related thereto.

(C) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention. (D) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work.  Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgment accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work. Author and Publisher by name.

(E) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States, but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith.  The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(F) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder. The Author agrees that if the present copyright law of the United States of America or of any other country in which the Work is protected by copyright shall be amended or changed or a new copyright law be enacted so that the term of copyright is extended or the benefits thereunder enlarged, the Publisher shall forthwith automatically become entitled to all of such enlarged benefits thereby conveyed for such extended term.

#### No Obligation to Publish

19.    Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish the Work if, in the sole and absolute judgment of its legal counsel, whether before or after or after acceptance thereof, the Work contains libelous or obscene material, or its publication may violate the right of privacy, common law or statutory copyright, or any other right of any person or entity.  In such event, Publisher shall be

11

entitled on demand to the return of all monies advanced to the Author hereunder, and to terminate this Agreement. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations assumed by Author hereunder, including, without limitation, the ongoing validity of Author's warranties and representations which shall apply to all material in the Work, whether or not changed at the request of Publisher's legal counsel.

#### Delays in Publication

20. (A) The Publisher, in its sole and absolute discretion, shall have the right to reschedule publication of the Work beyond the time set forth in Paragraph 17(a) for a reasonable time. If publication of the Work is delayed in the absence of excusable circumstances the Author's sole and exclusive remedy shall be to give the Publisher a notice in writing, stating that if the Publisher fails to publish the Work within 180 days after the date of such notice, then all of the Publisher's rights in and to the Work shall terminate at the end of such 180-day period; and if, in such event, the Publisher shall fail to publish the Work within such 180-day period, all of the Publisher's rights in and to the Work shall terminate and revert to the Author, and the Author shall be entitled, as liquidated damages and in lieu of all damages and remedies, legal or equitable, to retain all payments theretofore made to Author under this Agreement.

(B) If publication is delayed beyond the time set forth in Paragraph 17(a) because of acts or conditions beyond the control of the Publisher or its suppliers or contractors, including (by way of illustration and not by way of limitation) war, shortages of material, strikes, riots, civil commotions, fire or flood, the publication date shall be extended to a date six months following removal of the cause of the delay.

#### Out of Print Termination

21. If, at any time after the expiration of ten years from the date of first publication, the Publisher allows all of its editions of the Work to go out of print and such status continues in effect for six months after the Author has given Publisher written notice ("Reversion Notice") to put the Work back into print, and if there is no English language or foreign language reprint edition authorized by Publisher available or contracted for within such six-month period, then the Author may by a notice in writing terminate this Agreement (subject to any licenses previously granted, to any renewals or extensions thereof, and to Publisher's right to continue to share in the proceeds therefrom) by notice to Publisher. In the event of such termination the Author shall have the right to purchase any available plates or film of the Work at cost, and/or any remaining copies or sheets of the Work at cost. If the Author does not purchase such plates, film, copies or sheets, then the Publisher may dispose of them at any price and retain the proceeds of such sale. The Publisher is under no obligation to retain any such plates, film, copies or sheets. The Work shall not be deemed out of print as long as it is available from the Publisher in any edition, including electronic text editions.

### VI. Other Rights, Undertakings and Obligations

#### Author's Reserved Rights

22. All rights not expressly granted by the Author to the Publisher are reserved to the Author. The Author shall not exercise or dispose of any reserved rights in such a way as substantially to destroy, detract from, impair or frustrate the value of any rights granted

12

herein to the Publisher, nor shall the Author publish or permit to be published during the term of this Agreement any book or other writing based substantially on subject matter. material. characters or incidents in the Work without the written consent of the Publisher.

#### Payee

23. Publisher is hereby directed to pay all sums due to the Author under the terms of this Agreement, directly to the Author at the address set forth on page 1 of this Agreement.

#### Author's Representations and Warranties

24. Author warrants and represents that:

(A) Author is the sole author and proprietor of the Work

(B) Author has full power and authority to make this Agreement and to grant the rights granted herein, and Author has not previously assigned, transferred or otherwise encumbered the same; and Author has no prior agreement, commitment or other arrangement. oral or written, to write or participate in writing any other book-length work and will enter into no such agreement. commitment or other arrangement until after delivery and acceptance of the Work, whether alone or with another writer. and whether under Author's own name or a pseudonym:

(C) The Work has not been previously published;

(D) The Work is not in the public domain:

(E) The Work does not infringe any statutory or common law copyright or any proprietary right of any third party:

(F) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(G) The Work is not obscene and contains no matter the publication or sale of which would otherwise violate any federal or state statute or regulation. nor is it in any other manner unlawful, and nothing contained in the Work shall be injurious to the health of the user;

(H) the Work will be Author's next work (whether under Author's name or otherwise), and that Author will not publish or authorize publication of any other full-length work of which Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work, and at all intervening times. The Publisher may rely on the truth of said warranties and representations in dealing with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and

13

representations are true and correct; and any independent investigation by or for the Publisher, or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties.

#### Indemnity

25. (A) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorney's fees) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers.

(B) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

(C) Whenever any suit, claim or demand as to which Author's indemnity applies is brought or made against the Publisher, the Publisher may withhold payments due to the Author under this Agreement, or any other agreement between the Author and the Publisher, and apply the payments so withheld to Author's indemnity obligations hereunder.

#### Revised Editions

26. The Author shall revise the first and subsequent editions of the Work at the request of the Publisher and supply any new matter necessary from time to time to keep the Work up to date. If Author shall neglect, be incapable, be unwilling or, in Publisher's judgment will not be able to revise or supply new matter at a time and in a form satisfactory to Publisher, then Publisher shall have the right to engage some other person(s) to do so. When such revisions are not made by the Author, Publisher may cause such fact to be evidenced in the revised edition. Publisher shall have all rights in revised editions of the Work which Publisher has in the original edition of the Work.

#### Tie-in Editions

27. Author shall use best efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in and on the covers of Publisher's editions of the Work.

#### Care of Property

28. Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

14

Breach by Publisher

29.    Except as otherwise specifically provided in this Agreement, if the Publisher shall
commit a material breach of the Agreement and shall fail to remedy the breach within 60
days after receiving a written notice from the Author requesting the Publisher to remedy
such breach, the Author may by a notice in writing (a) revoke the Publisher's right to
publish the Work, if it has not been published at such time; (b) require the Publisher to
cease further publication of the Work, if it has been published at such time, but in such
event the Publisher shall be permitted to sell all copies of those editions of the Work
which have already been printed or are in the process of being printed; and (c) revoke the
grant to the Publisher of such of the subsidiary rights as the Publisher has not already
exercised or disposed of. In such event the Author shall have the right to purchase any
available plates or film of the Work at cost, and/or remaining copies or sheets of the
Work already printed at the Publisher's manufacturing cost. If the Author does not
purchase such plates, film, copies or sheets, the Publisher may dispose of them at any
price and retain the proceeds of such sale. The Publisher is under no obligation to retain
any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10
shall survive such termination.

Free Copies for Author, Purchases by Author

30.    The Publisher shall present the Author with two cases of each edition of the Work
published by the Publisher, upon publication. The Author shall have the right to purchase
additional copies for Author's own use, and not for resale, at a 40% discount from the
catalog retail price. If the Author wishes to purchase copies of the Work for resale,
Author shall negotiate the terms of such purchase with Publisher, it being understood that
any resale of the Work by Author shall be outside of regular trade channels. No copies
sold to Author shall be returnable to Publisher.

Publisher's Trademarks

31.    Nothing in this Agreement (including but not limited to the rights of Author to purchase
books and plates on termination) shall give Author any right in or to any trademark, trade
name, logo, imprint or other identification now or hereafter used by Publisher, nor shall
Author use any such identification during the term of this Agreement or thereafter, except
that Author may dispose of copies of the Work purchased hereunder notwithstanding that
such identification may appear thereon when purchased.

Third Party Copyright Infringement

32.    If during the existence of this Agreement the copyright, or any other right in respect to
the Work, is infringed upon or violated, the Publisher may, at its own cost and expense,
take such legal action, in the Author's name if necessary, as may be required to restrain
such infringement and to seek damages therefor. The Publisher shall not be liable to the
Author for the Publisher's failure to take such legal steps. If the Publisher does not bring
such an action, the Author may do so in Author's own name and at Author's own cost
and expense. Money damages recovered for an infringement shall be applied first toward
the repayment of the expense of bringing and maintaining the action, and thereafter the
balance shall be divided equally between the Author and Publisher.

Execution of Documents

15

33.     Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

## VII. Definitions

Definitions

34.     As used in this Agreement:

(A)     (i) "Electronic text rights" shall mean the exclusive right to publish, and to authorize others to publish, the Work (including any text, photographs and illustrations in the Work) in whole or in part, in visual form for reading, by any electronic, electromagnetic or other means of storage, retrieval, devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without approval of the Author, such approval not unreasonably to be withheld or delayed. Any license of electronic text rights of the Work shall provide that any additions to, deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the approval of the Author, such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the Work including without limitation still photographs and illustrations, video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights, motion picture rights and television rights (provided that the exercise of any of the foregoing rights, if reserved by the Author or licensed to a third party, shall not preclude the exercise of the electronic adaptation rights).

(B) "audio rights" shall mean the exclusive right to use or adapt, and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes, audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights;

(C) "Theme park rights" shall mean the exclusive right to use all or any portion of the Work in and in connection with amusement/tour/theme parks. Such rights shall include, without limitation, the right to (i) create, present, stage and/or perform any attraction, presentation, show and/or ride based upon and/or derived from the Work; (ii) use "walk-

16

around" performances by attraction, presentation, show and/or rider; and (vi) use any of the foregoing to advertise, exploit and/or promote any such amusement/tour/theme park.

(D) A "sale," "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

(E) "high discount sales" shall mean sales made in the United States where the discount to jobbers or to wholesale distributors or booksellers on copies of any edition published by the Publisher is forty-six percent (46%) or more (except for "special discount sales" and "remainder-in-place sales" as defined below);

(F) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 60% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 65% from the catalog retail price. With respect to special discount sales to organizations, Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(G) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(H) "book manufacturing cost" shall mean the cost incurred for text and cover. The cost is calculated by the number of copies printed.

(I) "freight shipping cost" shall mean the cost incurred from book manufacturing company to Publisher warehouse.

(J) "inside book layout" shall mean the cost incurred to transfer said Work from Microsoft Word document to a book manufacturing-friendly document. Usually but not limited to a Pagemaker file.

(K) "editorial cost" shall mean the cost incurred to have content of Work, proof-read, content edited and developmental editing.

## VIII. Miscellaneous Provisions

### Assignment

35.  This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgment of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. Any purported assignment in violation of this provision shall be void.

### Effectiveness

17

36.  This Agreement shall be binding only when it has been signed by the Author and by an authorized officer of the Publisher.

### Jurisdiction

37.  Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County, New York, to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law, each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business. The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail, postage paid, to the same address.

### Notices

38.  All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent.

### Applicable Law

39.  THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

### Waivers

40.  No waiver of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher following notice or claim of facts which, if true, would constitute a breach of warranty, representation or agreement of the Author, constitute or imply any waiver by the Publisher of any defenses, rights or remedies of the Publisher. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

### Validity and Enforceability

41.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

### Singular Shall Include Plural

42. Wherever required by the context in this Agreement, the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

**Entire Agreement**

43. This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof, and may not be modified except by an instrument in writing signed by the party to be charged.

**Captions**

44. Captions are for convenience only, and are not to be deemed part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

AUTHOR

Signature: _____

Soc. Sec.#: __ REDACTED
Citizenship: _____

MELODRAMA PUBLISHING, LLC

_____
Crystal Winslow, Publisher

19

# EXHIBIT C

MELODRAMA PUBLISHING, LLC
P.O. BOX 522
BELLPORT, NY 11713-0522

AGREEMENT made the 1st of August, 2009 between Melodrama Publishing, LLC (the "Publisher") P.O.BOX 522, BELLPORT, NEW YORK 11713-0522, and Kiki Swinson (the "Author") of 618 Zephyr Court, Virginia Beach, VA 23462.

In consideration of the premises hereinafter set forth, Publisher and Author hereby agree with respect to a novel tentatively entitled Notorious Part 3 (the "Work") to be published by Melodrama Publishing.

## I. Rights Granted

### The Grant and the Territory

1.     (A) The Author grants publisher during the full term of copyright and any renewal or extensions thereof the exclusive right to publish the Work in all print, digital, and audio formats and media, including the right to exercise or license the rights set forth in Paragraph 2 throughout the world (the "Exclusive Territory") in the English language and all other languages.

(B) The Author agrees that, while the Work is in print, he or she will not, without the written permission of the Publisher, publish or cause to be published any material based on material in the work which, in the Publisher's reasonable judgment, is likely to compete with the sale of the work or diminish the value of any subsidiary rights granted by this Agreement, except that the Author may grant licenses for the exploitation of any right reserved to the Author under this Agreement.

### Subsidiary Rights

2.     (A) The publisher shall have the exclusive right in the Exclusive Territory, and the non-exclusive right in any other territories set forth in Paragraph 1, to exercise the following rights in the Work or to license such rights upon terms as Publisher deems advisable: book club rights; anthology/permission rights; first serial rights (i.e. publication before first publication in book form); second serial rights (i.e. publication after first publication in book form); abridgment, condensation and digest rights; calendar rights; large print rights; reprint and special edition rights; electronic text rights and electronic adaptation rights as defined in Paragraph 34(A); audio rights as defined in Paragraph 34(B); British Commonwealth rights; foreign language rights; and theme park rights as defined in Paragraph 34 (C).

(B) Any grant of first or second serial rights shall specifically prohibit the licensee from reproducing all or a substantial portion of the Work.

(C) Publisher may license others without compensation to Publisher or Author to publish the Work in Braille or other forms for the handicapped.

(D) Publisher may authorize copyright and permissions clearance organizations to act in full or in part on its behalf and Publisher shall account to the Author for royalties received from such organizations designated as arising from reproduction of the Work.

I

(E) The party who controls motion picture, dramatic and television rights is authorized to publish and to license others to publish, in any form, excerpts, summaries and serializations, none to exceed 7, 500 words in length, of motion picture, television, stage and other dramatizations based upon the Work for use in advertising and promotion of any such dramatization, and not for resale. The party who authorizes such publication shall take all commercially reasonable steps to protect the copyright in the Work.

(F) The Publisher shall notify the Author promptly after each disposition of rights, but inadvertent failure to do so will not be deemed a breach of this agreement. The Publisher shall provide the Author with copies of any license agreements relating to the Work of the Author's request therefor.

(G) Publisher shall have the right to license the rights set forth in subparagraph (a) above to Publisher's parent, subsidiaries, affiliates and divisions, provided that the terms for such license are no less favorable to the Author than the terms which Publisher in its reasonable judgment would accept from an unrelated third party licensee for the same rights.

(H) If Publisher itself exercises any rights for which no royalty rate is set forth below, Publisher and Author shall negotiate and agree upon a mutually acceptable royalty.

#### Option

3.   The Author grants the Publisher an exclusive option to acquire the Author's next (i.e., written work after the Work) full length work of fiction for publication on mutually satisfactory terms. If, within 60 days following submission of a reasonably detailed outline of such work to the Publisher, or within 60 days after publication of Work, whichever shall be later, Publisher and Author are unable in good faith to agree upon terms for publication, the Author shall be free thereafter to submit such next work to other publishers, provided, however, that the publisher shall retain the first option to acquire the work on terms no less favorable to the Author than those offered by any other publisher. During the exclusive period of this option, Author shall not submit such next work to other publishers, nor seek offers from or negotiate with others with respect thereto.

### II. Manuscript Delivery

#### Delivery of the Manuscript, Related Materials and Permissions

4.   (A) The Author shall deliver to the Publisher one copy of the complete, legible, typewritten manuscript of the Work in the English language (double-spaced, properly margined), satisfactory to the Publisher in length, content and form, on or before April 1, 2010. The Work shall be approximately 80,000 words in length. The Author shall also deliver diskettes or other electronic format specified by Publisher containing the Work.

(B) As part of the complete manuscript, the Author shall, at Author's expense, furnish to Publisher photographs, drawings, charts, maps, illustrations, appendix, bibliography and other related material (herein "related materials") necessary in Publisher's opinion for publication of the Work, all in content and form satisfactory to Publisher. If the Publisher decides there is to be an index in the Work the Publisher will be responsible for preparation of the index and shall deduct the cost thereof from any advances payable to the Author under this Agreement or, at Publisher's option, charge such cost against the Author's royalty account.

2

(C) If permission from others is required for publication of any material contained in the Work or for exercise of any of the rights conferred by this Agreement. Author shall obtain such permissions at Author's expense, in form acceptable to Publisher, and shall deliver such permissions to the Publisher as part of and together with the complete manuscript of the Work. Permissions shall cover all territories, rights and editions covered by this Agreement.

(D) If the Author fails to deliver the related materials or required permissions, Publisher shall have the right, but not obligation. to obtain the same and in such event the cost of such preparation shall be borne by the Author as follows: (i) Author shall immediately pay such cost upon receipt of an invoice from Publisher; (ii) Publisher may deduct such cost from any advances and/or royalties otherwise payable to the Author under this Agreement, provided however that if Publisher seeks to deduct such cost from earned royalties, and if the advance payable to the Author under this Agreement is unearned one year after publication of the Work. then Author will immediately reimburse Publisher for such cost upon receipt of an invoice from Publisher.

(E) If the complete manuscript of the Work is timely delivered but is not satisfactory to the Publisher, the Publisher may (but shall have no obligation to) notify the Author in writing giving the Author thirty (30) days to make satisfactory revisions. If the Publisher does so. and if at the end of the thirty (30) day extension, the manuscript is still unsatisfactory, the Publisher shall have the right, but not obligation, to obtain the services of a writer for hire to revise the Work and in such event the cost of such preparation shall be borne by the Author as follows: (i) Author shall immediately pay such cost upon receipt of an invoice from Publisher: or (ii) Publisher may withhold payment of advances, royalties and/or subsidiary rights income otherwise due to Author under this Agreement and deduct costs therefrom until the debt is satisfied, provided however that if payments otherwise due to Author under this Agreement are inadequate for recoupment of such costs one year after publication of the Work, then Author will immediately reimburse Publisher for such costs upon receipt of an invoice from Publisher.

## III. Book Manufacturing

Costs:

(A)  Author agrees that prior to printing costs that she is responsible for the Publishers expenses deriving from Work, including but not limited to model and cover design. Failure to pay by Author of said cost will be considered a lien from future income from said Work until debt is reconciled.

(B)  Author agrees that if there is a dispute regarding publication and/or distribution of said Work between Publisher and Author then no Work will be printed, distributed or marketed until said dispute is resolved legally or in writing between Publisher and Author.

(C)  Author shall pay all amounts accruing for trade publication of Work including but not limited to book manufacturing as defined in Paragraph 34 (H), freight shipping as defined in Paragraph 34 (I). inside book layout as defined in Paragraph 34 (J), and editorial costs as defined in Paragraph 34 (K) under this Agreement.

(D)  Author and Publisher agree that first printing cost as described in Paragraph 34 (II) will be 10,000 units and will not exceed 10,000 units.

(E)  Author agrees that she will not request an advance on copies sold from the Work to facilitate printing costs or for any other unforeseeable reason(s).

(F)  Author agrees:

3

(1) Author royalty rate immediately reverts back to 10% off retail price on all trade publication after the first 10.000 copies are sold.

(2) Any and all printing rights will be determined by Publisher.

(3) After the first 10,000 copies are printed and sold, the right to pay for trade publication printing transfers to Publisher and that right remains transferred indefinitely.

(G) Publisher shall pay all amounts to ensure delivery to Melodrama's warehouse, any and all book chains and distribution centers, Melodrama's warehouse fees. ISBN. and bar code for Melodrama Publishing.

(H) Publisher reserves the right to choose recognized shipping companies including but not limited to UPS. FedEx, or DSL for shipping purposes under this Agreement.

(I) Publisher reserves the right to hire and/or subcontract out for purposes of said Work and Author agrees to abide by Publishers decision in any and all matters pertaining to this Agreement.

(J) Publisher and Author both agree that the terms and conditions under this Agreement are limited to this Work only and the only modification from previous Works with Publisher and Author are the Author's royalty rate on trade publication for 10.000 copies as outlined below in Royalties 5 (A) and (B).

### Royalties

5. Publisher and Author agree that the terms and conditions of the royalty rate defined below only pertain to trade paperback publication as set forth above in III Book Manufacturing costs. The Publisher shall pay the Author royalties on all copies of the Work (subject in each case to the exception set forth above and below), less returns as follows:

   (A) If published as a trade paperback edition, 60% of the wholesale price on the first 10.000 copies sold, subject to the exceptions set forth above in III Book Manufacturing Costs.

   (B) Author agrees that the royalty rate immediately reverts back to 10% off the retail price after the first 10,000 copies are sold as set forth above in III Book Manufacturing Costs on trade paperback.

   (C) If published as a mass-market edition, 8% of the retail price on the first 100,000 copies sold, and 10% of the suggested catalog retail price on all copies sold thereafter;

   (D) If published as an electronic text (e-book) edition, twenty-five percent (25%) of the amounts received by the Publisher, excluding taxes and invoiced shipping and handling charges, if any.

   (E) If published as an audio edition, 7% of the catalog retail price on the first 10.000 copies sold, 7¼ of the catalog retail price on the next 10,000 copies sold, and 7½ of the catalog retail price on all copies sold thereafter;

   (F) If published as a large print edition, 15% of the net amount actually received from the sales;

   (G) If published as a low-cost hardcover edition, 15% of the net amount actually received from such sales;

   (H) If published as a calendar based upon the Work, 15% of the net amount actually received from such sales;

4

Exceptions:

(I) On copies of the trade paperback editions sold to third parties for export or outside the United States by the Publisher or its affiliates, royalties shall be calculated on the net amount actually received from such sales. On copies of the mass-market paperback, large print and low-cost hardcover editions sold to third parties for export or outside the United States by Publisher or its affiliates, the royalty shall be 7% of the net amount actually received from such sales. On copies of the audio edition sold for export to third parties or outside the United States by Publisher or its affiliates, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(J) on mail order sales and other direct response sales, the royalty shall be 7% of the net amount actually received from such sales, except that on mail order sales and other direct response sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(K) on high discount sales (as defined in Paragraph 34 (E)) of Publisher's paperback editions, the royalty shall be 10% of the net amount Publisher actually received from such sales; if such copies are sold on a non-returnable basis, no reserve against returns shall be held on account of such non-returnable copies.

(L) on special discount sales (as defined in Paragraph 34(F)) of Publisher's paperback editions, the royalty shall be 7% of the net amount Publisher actually received from such sales, except that on special discount sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales;

(M) On all copies sold through special arrangements with book clubs, the royalty shall be ½ the prevailing royalty rate. On copies sold to book clubs on a royalty-inclusive basis, the royalty shall be 7% of the net amount actually received from such sales, except that on copies of the audio edition sold to book clubs on a royalty-inclusive basis, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales:

(N) on remainder-in-place sales (as defined in Paragraph 34(G)) and remainder sales, the royalty shall be 7% of the net amount actually received from such sales, except that on remainder-in-place sales and remainder sales of the audio edition, the royalty shall be one-half the prevailing rate in subparagraph (d) above, calculated on the net amount actually received from such sales, except that no royalty shall be payable on copies of the Work sold at discount of 85% or more from the catalog retail price;

(O) limited reprint: with respect to copies of regular hardcover editions of the Work sold by the Publisher in the United States from any reprinting by the Publisher of two thousand five hundred (2,500) copies or less made at least two (2) years after the date of initial publication of the Work, a royalty at a rate equal to three-fourths (3/4) of the rate which would otherwise apply under this paragraph 6. The same three-quarters (3/4) royalty shall be payable on reprints of fifteen hundred (1,500) copies or less regardless of when made: These reductions in royalty will enable the Publisher to keep the Work in print as long as possible.

(P) On any revised edition of the Work, royalties will be computed separately from the number of copies sold of prior editions. If individuals other than Author revise any

5

edition of the Work and are entitled to royalties on such edition, then Author shall receive royalties on such edition at rates to be negotiated in good faith.

(Q) on Publisher's exercise of commercial or merchandising rights, the parties shall negotiate in good faith to establish a royalty rate.

## Proceeds on License of Subsidiary Rights

7. The Publisher shall pay the Author 25% of the proceeds received by Publisher from the sale or license of subsidiary rights, except as follows:

| Type of Right | Author's Share | Publisher's Share |
|---|---|---|
| First serial rights (i.e., publication Before first publication in book form | 50% | 50% |
| British Commonwealth right for all Editions of the Work except the audio Edition | 50% | 50% |
| Foreign language rights | 50% | 50% |
| Theme park rights as defined in Paragraph 34(C) Commercial and Merchandising (derivative products such as the use of a title or character for clothing or toys) | 50% 50% | 50% 50% |
| Performance (television, radio, dramatic, musical, motion picture and video rights and allied merchandising rights derived therefrom), 50% | | 50% |

In calculating the proceeds on disposition of the subsidiary rights, Publisher may deduct from the gross amount received any third party agent's commission which may be paid for services rendered in connection with such disposition, and any bank fees or other monetary transfer charges incurred by the Publisher in connection with or by reason of such sale or disposition.

## Special Royalty Provisions

8. With respect to each edition of the Work published hereunder, the following shall be applicable:

(A) No royalty shall be payable on copies damaged or destroyed or on copies furnished gratis for review, publicity, promotion, Author's promotion, Author's free copies, sample or similar purposes, or sold below or at cost including expenses incurred, or sold to the Author for Author's personal use or resale;

(B) no royalty shall be payable on sales by Publisher to its parent, subsidiaries, affiliates, or related divisions for resale, but any resale thereby shall be deemed a sale by Publisher subject to the applicable royalty herein provided;

6

(C) In some instances Publisher prints on the jackets and/or covers of its books a suggested cover price that is higher than its catalog retail price. In such instances, where the royalty is based on the retail price, the catalog retail price, not the suggested cover price, shall be the basis for the computation. The difference between the two prices enables the retailer to recoup its freight costs;

(D) When the Publisher in its sole discretion determines that copies of the Work are not readily salable at regular prices within a reasonable time, the Publisher may remainder copies of the Work or dispose of such copies as surplus at the best price obtainable. Publisher shall make no remainder sale (other than a remainder-in-place sale) without first offering copies to the Author at the estimated remainder price, provided, however, that inadvertent failure to offer such copies to the Author will not be deemed a material breach of this Agreement;

(E) any advance royalties or other sums paid to or on behalf of the Author under this Agreement, and any amounts otherwise due from the Author to the Publisher, may be applied in reduction of any amounts otherwise payable to the Author under this Agreement;

(F) in the event of any overpayment by Publisher to Author, Publisher may, in addition to any other remedies available to it, recoup such overpayment from any sums due to Author under this Agreement or any other agreement between Author and Publisher;
(G) Any royalties payable to the Author hereunder shall be subject to such reasonable reserve for returns of copies of the Work as the Publisher shall establish in its reasonable discretion;

(H) If the Publisher exercises rights for which royalties are not specially set forth in this Agreement, then royalties shall be paid to the Author at rates to be negotiated in good faith by the Author and Publisher.

Royalty Statements

9.    (A) Publisher shall render royalty statements and make payments of sums due thereon to the Author (i) in February for the preceding period April 1 to September 30, and (ii) in August for the preceding period October 1 to March 31. Publisher may from time to time change such accounting periods provided no longer than six months elapses between any two accountings to the Author. If for any royalty period the current period total activity in the Author's account for the Work is less than $100, Publisher may defer the rendering of payment until such royalty period as the cumulative activity since the last statement exceeds such amount.

(B) Royalty statements shall state the number of copies sold and returned during the period covered and the reserve for returns being held by the Publisher. If the Author so requests in writing, the Publisher shall, within 60 days after its receipt of such request, advise the Author in available detail of the number of copies printed, sold, and given away during the current period covered by the last royalty statement rendered to the Author, as well as the approximate number of salable copies on hand at the end of said period.

(C) Statements rendered hereunder shall be final and binding upon the Author unless objected to in writing, setting forth the specific objections thereto and the basis for such objections, within two years after the date the statement was rendered.

### Examination of Publisher's Books and Records

10.   The Author or the Author's certified public accountant may, upon written request not more than once each year, conduct a reasonable examination of the books and records of the Publisher insofar as they relate to the Work for the period of two years immediately preceding such examination. Such examination shall be on Publisher's premises during normal business hours at a time convenient to Publisher, but no later than 90 days after Author's request thereof, and shall be at Author's expense. Such examination shall last no longer than five (5) business days.

## IV. Failure to Deliver the Manuscript; Acceptance of the Manuscript

### Failure to Deliver the Manuscript

11.   Timely delivery of the Work, satisfactory to the Publisher in length, content and form, is essential to the Publisher and is of the essence of this Agreement. If Author fails to deliver the complete manuscript of the Work, satisfactory to the Publisher in length and form, within the time specified, the Publisher shall have the option to give the Author a notice in writing terminating this Agreement, and in such event the Publisher may then recover and the Author shall repay on demand all amounts advanced to the Author, and any monies spent by Publisher on behalf of said Work, including but not limited to the cover, promotions and web site promotions. In the event that the Author completes a manuscript for the Work after termination of this Agreement pursuant to the preceding sentence, then the Publisher shall have the option, exercisable within 30 days after receipt of said manuscript, to acquire the Work on the same terms and conditions as provided in this Agreement. The Author shall not submit the said manuscript to any agent or any other publisher until and unless the Publisher declines to acquire such manuscript.

### Extension of Time to Deliver

12.   Publisher may in its discretion extend for such period as in its judgment is appropriate, or refuse to extend, Author's time to deliver the complete manuscript. Any extension of the delivery date must be in writing signed by the Publisher. In determining whether to grant such extension and/or the length thereof, Publisher may consider such factors as Publisher deems relevant, including without limitation, Author illness and the changing marketability of the Work.

### Acceptance of Manuscript

13.   (A) The Publisher shall not be obligated to accept or publish Work if in its sole judgment the Work is not acceptable to it. If the Author delivers a manuscript of the Work within the time specified, in what the Author represents to be its complete and final form, the Publisher shall, within 90 days after its receipt thereof, determine whether the Work is acceptable to it.   Publisher may elect to request in writing that Author make revisions, changes or supplements ("revisions") thereto. If Publisher requests one or more revisions in the manuscript as submitted or as thereafter revised. Publisher's time to determine the acceptability thereof shall be extended for a period of 60 days after resubmission by the Author, or 60 days after Publisher's receipt of written notice by Author that no further revisions will be made. Author will make revisions as promptly as possible after Publisher's request therefor (and in no event shall Publisher be required to wait more than 60 days to receive such revisions). No request for revisions shall be deemed to obligate Publisher to accept the final revision or to constitute a conditional acceptance thereof. If

8

the Publisher in its sole discretion determines to submit the manuscript to a legal review, the Author shall cooperate with the Publisher or Publisher's counsel in such review and notwithstanding anything to the contrary in this Agreement the time for Publisher to accept or reject the Work shall be extended to 30 days after completion of the legal review.

(B) Acceptance of the manuscript shall be made only by written notice signed by an authorized signatory of the Publisher. Payment of an advance installment, payable by express provision hereof upon acceptance of the manuscript, shall not constitute written notice of acceptance unless such payment is accompanied by a written notice of acceptance. Acceptance of or payment for a portion of the manuscript shall not obligate Publisher to accept or pay for the entire manuscript.

(C) If the Publisher fails to accept the complete manuscript or revised complete manuscript within the time periods provided in subparagraph (A) above, the Author shall thereafter have the right to notify Publisher in writing that unless the manuscript is accepted or written request for revisions provided within 15 business days after the delivery of such notice, the manuscript will be deemed unacceptable and this Agreement shall terminate in accordance with the provisions of subparagraph (D) below.

(D) If the complete manuscript or revised complete manuscript delivered by the Author is not. in Publisher's sole judgment, acceptable to the Publisher, the Publisher shall so notify the Author, and the Author shall promptly repay all sums advanced to the Author hereunder and upon such repayment this Agreement shall terminate.

(E) In the event of termination of this Agreement because the complete manuscript or revised complete manuscript is unacceptable to the Publisher, the Author or the Author's duly authorized representative shall make every effort to sell the Work elsewhere, and the Author shall be obligated to repay all sums advanced hereunder; but for a period of 18 months after termination of this Agreement such obligation shall be limited to repayment from (i) the first (and all) proceeds of any contracts with others concerning the Work or any rights thereto, including, without limitation, rights listed in Paragraphs 1 and 2 above, and (ii) any payments due Author from Publisher for any reason. Author hereby transfers and assigns to Publisher, as security for the repayment of any advances which may become repayable pursuant to this paragraph, any and all monies which may hereafter become due or owing to Author from other persons or entities as a result of Author's rights with respect to the Work, and Author's hereby authorizes Publisher to apply such monies as and when received in liquidation of Author's obligation to repay such advances, until such obligation shall have been fully paid. Author hereby authorizes such other person or entity to give full force and effect to this assignment, and hereby releases and discharges such other person or entity from any and all liability to Author for any and all payment or payments made to Publisher pursuant to this paragraph. At the end of the 18-month period any sums that have not been repaid or recovered from other sums due to the Author shall become immediately due and payable to the Publisher.

## Editing

14. The Author shall work with an editor approved by the Publisher or employee of Publisher and make all necessary changes to the manuscript and submit the edited manuscript to the Publisher for approval. The Publisher shall review the edited manuscript.

## V. Production and Publication of the Work

## Correction of Proofs

9

15. Publisher shall furnish Author with one set of galleys or other first proofs, and, at its option, subsequent proofs, and the Author shall return each set of proofs with Author's corrections to the Publisher within 21 days of receipt thereof. The Publisher also shall proofread the proofs. If the Author shall fail to return the corrected proofs within the 21-day period herein specified, the Publisher may publish the Work without the Author's approval of the proofs–provided, however, that if, because of illness or any other factor beyond the Author's control, the Author informs the Publisher that Author is unable so to return the corrected proofs, Author's time for correcting such proofs shall be extended for a single additional 14-day period, and after that period the Publisher may publish the Work without the Author's approval of the proofs.

### Cost of Author's Alterations

16. If, in the correction of proofs, the Author requests changes from the text of the accepted manuscript, the Author shall bear the cost of such changes, over 15% of the original cost of composition, as follows: (a) Author shall immediately pay such costs upon receipt of an invoice from Publisher; (b) Publisher may withhold a portion of any advances payable to the Author under this Agreement and deduct such costs from said advances; or (c) at Publisher's option, Publisher may charge such cost to Author's royalty account, provided however that if the advance payable to the Author under this Agreement is unearned one year after publication of the Work, then the Author will immediately reimburse Publisher for such costs upon receipt of an invoice from Publisher. At Author's request Publisher shall submit an itemized statement of such charges and shall make available corrected proofs for the Author's inspection at the Publisher's office.

### Publication

17. (A) The Publisher shall publish the Work in book form within 24 months after acceptance of the manuscript therefor. Publication shall be in any edition, any format, and under any imprint of Publisher or its affiliates that Publisher elects.

(B) Publisher shall have the right to use the name, pseudonym, portrait and picture of and biographical material concerning Author in and on the Work, in the advertising, publicity and promotion thereof, and in connection with any rights granted hereunder. Author shall furnish Publisher, free of charge, original photographs of Author which Publisher may use for such purposes without additional payment to or permission from any third party.

(C) The title of the Work as set forth on page 1 may be changed by mutual agreement of the Author and the Publisher.

(D) The format, imprint, style of printing and binding, and all matters relating to the manufacture, sale, distribution, advertising and promotion of the Work shall be determined at the sole discretion of the Publisher.

(E) The Publisher may publish and authorize others to publish extracts of the Work containing not more than one chapter for promotion of the Work, without compensation therefor. If the compensation is received it shall be shared equally by Author and Publisher.

(F) Author hereby consents to Publisher's advertising inside the front and back covers and/or in the last four pages of Publisher's editions, books in print of Author or others, and any other publishing-related advertisement associated with Publisher or with any other of Publisher's parent, subsidiaries, affiliates or divisions. No other advertising will

10

be printed in, included in (bound or unbound), distributed with or inserted into any copies of Publisher's editions of the Work without Author's prior written consent.

## Copyright

18.   (A) The Publisher shall identify the Author as the owner of the copyright in the Work and may register such copyright in the United States in the name of the Author.

(B) The Publisher shall identify the Author as the owner of the © copyright in any audio edition(s) of the Work. The Publisher shall be identified as the owner of the (℗) copyright in any audio edition(s) of the Work. Author hereby assigns, and Publisher shall own. all right. title and interest in and to all additions to. alterations of or revisions of Work for the audio edition(s), and all drafts. notes. scripts. voice recordings and musical recordings related thereto.

(C) The Publisher shall print in each copy of each edition of the Work published by it any notice required to comply with the applicable copyright laws of the United States and the provisions of the Universal Copyright Convention and the Berne Copyright Convention. (D) Any agreements made by the Author or by the Publisher to dispose of any rights in the Work shall require the licensee or grantee to take all necessary and appropriate steps to protect the copyright in the Work. Whichever party controls first serial rights in the Work will use best efforts to require any licensee of such rights to include an acknowledgment accompanying the published excerpt stating that the excerpt is from an upcoming work to be published by the Publisher and setting forth the title of the Work, Author and Publisher by name.

(E) The Publisher may take such steps as it deems appropriate to copyright the Work in countries other than the United States. but the Publisher shall be under no obligation to procure copyright in any such countries, and shall not be liable to the Author for any acts or omissions by it in connection therewith. The Author may copyright the Work in any foreign country if the Publisher fails to take steps to obtain such a copyright within 30 days after receiving a written request from the Author to do so.

(F) Author hereby appoints Publisher to be Author's attorney-in-fact to execute and to file any and all documents necessary to record in the Copyright Office the assignment of exclusive rights made to Publisher hereunder. The Author agrees that if the present copyright law of the United States of America or of any other country in which the Work is protected by copyright shall be amended or changed or a new copyright law be enacted so that the term of copyright is extended or the benefits thereunder enlarged. the Publisher shall forthwith automatically become entitled to all of such enlarged benefits thereby conveyed for such extended term.

## No Obligation to Publish

19.   Notwithstanding anything contained herein to the contrary, the Publisher shall not be obligated to publish the Work if, in the sole and absolute judgment of its legal counsel. whether before or after or after acceptance thereof, the Work contains libelous or obscene material, or its publication may violate the right of privacy. common law or statutory copyright. or any other right of any person or entity. In such event, Publisher shall be entitled on demand to the return of all monies advanced to the Author hereunder. and to terminate this Agreement. Notwithstanding any request by Publisher for change or substantiation, nothing in this Agreement shall be deemed to impose upon the Publisher any duty of independent investigation or to relieve the Author of any of the obligations

11

assumed by Author hereunder, including, without limitation, the ongoing validity of
Author's warranties and representations which shall apply to all material in the Work,
whether or not changed at the request of Publisher's legal counsel.

#### Delays in Publication

20. (A) The Publisher, in its sole and absolute discretion, shall have the right to reschedule
publication of the Work beyond the time set forth in Paragraph 17(a) for a reasonable
time. If publication of the Work is delayed in the absence of excusable circumstances the
Author's sole and exclusive remedy shall be to give the Publisher a notice in writing,
stating that if the Publisher fails to publish the Work within 180 days after the date of
such notice, then all of the Publisher's rights in and to the Work shall terminate at the end
of such 180-day period; and if, in such event, the Publisher shall fail to publish the Work
within such 180-day period, all of the Publisher's rights in and to the Work shall
terminate and revert to the Author, and the Author shall be entitled, as liquidated
damages and in lieu of all damages and remedies, legal or equitable, to retain all
payments theretofore made to Author under this Agreement.

(B) If publication is delayed beyond the time set forth in Paragraph 17(a) because of acts
or conditions beyond the control of the Publisher or its suppliers or contractors, including
(by way of illustration and not by way of limitation) war, shortages of material, strikes,
riots, civil commotions, fire or flood, the publication date shall be extended to a date six
months following removal of the cause of the delay.

#### Out of Print Termination

21. If, at any time after the expiration of ten years from the date of first publication, the
Publisher allows all of its editions of the Work to go out of print and such status
continues in effect for six months after the Author has given Publisher written notice
("Reversion Notice") to put the Work back into print, and if there is no English language
or foreign language reprint edition authorized by Publisher available or contracted for
within such six-month period, then the Author may by a notice in writing terminate this
Agreement (subject to any licenses previously granted, to any renewals or extensions
thereof, and to Publisher's right to continue to share in the proceeds therefrom) by notice
to Publisher. In the event of such termination the Author shall have the right to purchase
any available plates or film of the Work at cost, and/or any remaining copies or sheets of
the Work at cost. If the Author does not purchase such plates, film, copies or sheets, then
the Publisher may dispose of them at any price and retain the proceeds of such sale. The
Publisher is under no obligation to retain any such plates, film, copies or sheets. The
Work shall not be deemed out of print as long as it is available from the Publisher in any
edition, including electronic text editions.

### VI.    Other Rights, Undertakings and Obligations

#### Author's Reserved Rights

22. All rights not expressly granted by the Author to the Publisher are reserved to the Author.
The Author shall not exercise or dispose of any reserved rights in such a way as
substantially to destroy, detract from, impair or frustrate the value of any rights granted
herein to the Publisher, nor shall the Author publish or permit to be published during the
term of this Agreement any book or other writing based substantially on subject matter,
material, characters or incidents in the Work without the written consent of the Publisher.

12

Payee

23.    Publisher is hereby directed to pay all sums due to the Author under the terms of this Agreement. directly to the Author at the address set forth on page 1 of this Agreement.

Author's Representations and Warranties

24.    Author warrants and represents that:

(A) Author is the sole author and proprietor of the Work

(B) Author has full power and authority to make this Agreement and to grant the rights granted herein. and Author has not previously assigned, transferred or otherwise encumbered the same; and Author has no prior agreement, commitment or other arrangement, oral or written, to write or participate in writing any other book-length work and will enter into no such agreement, commitment or other arrangement until after delivery and acceptance of the Work, whether alone or with another writer, and whether under Author's own name or a pseudonym;

(C) The Work has not been previously published;

(D) The Work is not in the public domain;

(E) The Work does not infringe any statutory or common law copyright or any proprietary right of any third party:

(F) the Work does not invade the right of privacy of any third person, or contain any matter libelous or otherwise in contravention of the rights of any third person; and, if the Work is not a work of fiction, all statements in the Work asserted as facts are true or based upon reasonable research for accuracy;

(G) The Work is not obscene and contains no matter the publication or sale of which would otherwise violate any federal or state statute or regulation, nor is it in any other manner unlawful. and nothing contained in the Work shall be injurious to the health of the user.

(H) the Work will be Author's next work (whether under Author's name or otherwise), and that Author will not publish or authorize publication of any other full-length work of which Author is an author or co-author until six months after publication of the Work.

Each of the foregoing warranties and representations shall survive the termination of this Agreement.

Each of the foregoing warranties and representations is true on the date of the execution of this Agreement and shall be true on the date of publication of the Work. and at all intervening times.   The Publisher may rely on the truth of said warranties and representations in dealing with any third party in connection with the exercise or disposition of any rights in the Work. The Publisher shall be under no obligation to make an independent investigation to determine whether the foregoing warranties and representations are true and correct; and any independent investigation by or for the Publisher. or its failure to investigate, shall not constitute a defense to the Author in any action based upon a breach of any of the foregoing warranties.

13

### Indemnity

25.     (A) The Author shall indemnify and hold the Publisher harmless against any loss, liability, damage, cost or expense (including reasonable attorney's fees) arising out of or for the purpose of avoiding any suit, proceeding, claim or demand or the settlement thereof, which may be brought or made against the Publisher by reason of the publication, sale, or distribution of, or disposition of rights in respect to the Work, based on the contents of the Work, except in connection with matters involving solely controversies arising out of or based on commercial transactions between the Publisher and its customers.

   (B) Prompt notice of any suit, proceeding, claim or demand brought or made against the Publisher or Author shall be given to the Author or Publisher respectively.

   (C) Whenever any suit, claim or demand as to which Author's indemnity applies is brought or made against the Publisher, the Publisher may withhold payments due to the Author under this Agreement, or any other agreement between the Author and the Publisher, and apply the payments so withheld to Author's indemnity obligations hereunder.

### Revised Editions

26.     The Author shall revise the first and subsequent editions of the Work at the request of the Publisher and supply any new matter necessary from time to time to keep the Work up to date. If Author shall neglect, be incapable, be unwilling or, in Publisher's judgment will not be able to revise or supply new matter at a time and in a form satisfactory to Publisher, then Publisher shall have the right to engage some other person(s) to do so. When such revisions are not made by the Author, Publisher may cause such fact to be evidenced in the revised edition. Publisher shall have all rights in revised editions of the Work which Publisher has in the original edition of the Work.

### Tie-in Editions

27.     Author shall use best efforts to obtain for Publisher the right to publish tie-in editions in connection with any motion picture, television or other dramatic versions of the Work, and to use the title, artwork, photographs, and other material related to any such version and appropriate identification and credits therefrom in and on the covers of Publisher's editions of the Work.

### Care of Property

28.     Publisher shall not be responsible for loss or damage to any property of Author in Publisher's possession or that of its independent contractors or to anyone to whom delivery is made with Author's consent. Author shall retain copies of any such property and, in the case of photographs, the negative for each photograph furnished.

### Breach by Publisher

29.     Except as otherwise specifically provided in this Agreement, if the Publisher shall commit a material breach of the Agreement and shall fail to remedy the breach within 60

14

days after receiving a written notice from the Author requesting the Publisher to remedy such breach, the Author may by a notice in writing (a) revoke the Publisher's right to publish the Work, if it has not been published at such time; (b) require the Publisher to cease further publication of the Work, if it has been published at such time, but in such event the Publisher shall be permitted to sell all copies of those editions of the Work which have already been printed or are in the process of being printed; and (c) revoke the grant to the Publisher of such of the subsidiary rights as the Publisher has not already exercised or disposed of. In such event the Author shall have the right to purchase any available plates or film of the Work at cost, and/or remaining copies or sheets of the Work already printed at the Publisher's manufacturing cost. If the Author does not purchase such plates, film, copies or sheets, the Publisher may dispose of them at any price and retain the proceeds of such sale. The Publisher is under no obligation to retain any such plates, film, copies or sheets. Any right of the Author pursuant to Paragraph 10 shall survive such termination.

#### Free Copies for Author, Purchases by Author

30.     The Publisher shall present the Author with two cases of each edition of the Work published by the Publisher, upon publication. The Author shall have the right to purchase additional copies for Author's own use, and not for resale, at a 40% discount from the catalog retail price. If the Author wishes to purchase copies of the Work for resale, Author shall negotiate the terms of such purchase with Publisher, it being understood that any resale of the Work by Author shall be outside of regular trade channels. No copies sold to Author shall be returnable to Publisher.

#### Publisher's Trademarks

31.     Nothing in this Agreement (including but not limited to the rights of Author to purchase books and plates on termination) shall give Author any right in or to any trademark, trade name, logo, imprint or other identification now or hereafter used by Publisher, nor shall Author use any such identification during the term of this Agreement or thereafter, except that Author may dispose of copies of the Work purchased hereunder notwithstanding that such identification may appear thereon when purchased.

#### Third Party Copyright Infringement

32.     If during the existence of this Agreement the copyright, or any other right in respect to the Work, is infringed upon or violated, the Publisher may, at its own cost and expense, take such legal action, in the Author's name if necessary, as may be required to restrain such infringement and to seek damages therefor. The Publisher shall not be liable to the Author for the Publisher's failure to take such legal steps. If the Publisher does not bring such an action, the Author may do so in Author's own name and at Author's own cost and expense. Money damages recovered for an infringement shall be applied first toward the repayment of the expense of bringing and maintaining the action, and thereafter the balance shall be divided equally between the Author and Publisher.

#### Execution of Documents

33.     Each party hereto shall, upon request of the other, execute such documents as may be reasonably necessary to confirm the rights of the other party in respect of the Work or to carry out the intention of this Agreement.

15

## VII. Definitions

### Definitions

34.    As used in this Agreement:

(A)    (i) "Electronic text rights" shall mean the exclusive right to publish. and to authorize others to publish, the Work (including any text, photographs and illustrations in the Work) in whole or in part, in visual form for reading, by any electronic, electromagnetic or other means of storage. retrieval, devised, but excluding any other text rights provided for herein (an "electronic edition"). In the exercise of the electronic text rights, the Publisher shall not add any textual, visual or other material to the Work, delete any material from or otherwise edit the Work, or couple any electronic edition of the Work with other works without approval of the Author, such approval not unreasonably to be withheld or delayed. Any license of electronic text rights of the Work shall provide that any additions to. deletions from, or other editing of the text of the Work by the licensee, and the coupling of any electronic edition of the Work with other works, shall be subject to the approval of the Author. such approval not unreasonably to be withheld or delayed.

(ii) "Electronic adaptation rights" shall mean the exclusive right to adapt and publish, and to authorize others to adapt and publish, the Work or any portion thereof for one or more "electronic versions." As used herein, an "electronic version" shall mean an adaptation of the Work incorporating elements from sources other than the Work including without limitation still photographs and illustrations. video footage, sound and other text, for publication by any electronic, electromagnetic or other means of storage, retrieval, distribution or transmission now known or hereafter devised, but excluding electronic text rights, audio rights. motion picture rights and television rights (provided that the exercise of any of the foregoing rights. if reserved by the Author or licensed to a third party. shall not preclude the exercise of the electronic adaptation rights).

(B) "audio rights" shall mean the exclusive right to use or adapt. and to authorize others to use or adapt, the Work or any portion thereof as the basis for one or more non-dramatic audio recordings through any method of recording or transmission now known or hereafter devised, including, without limitation, copying or recording by phonographic, magnetic, laser, electronic or any other means and whether on phonograph records, audio cassettes. audio discs or any other human or machine-readable medium and the broadcast or transmission thereof, but excluding all uses encompassed in motion picture, dramatic, television, radio and allied rights:

(C) "Theme park rights" shall mean the exclusive right to use all or any portion of the Work in and in connection with amusement/tour/theme parks. Such rights shall include, without limitation, the right to (i) create, present, stage and/or perform any attraction, presentation, show and/or ride based upon and/or derived from the Work: (ii) use "walk-around" performances by attraction, presentation, show and/or rider; and (vi) use any of the foregoing to advertise, exploit and/or promote any such amusement/tour/theme park.

(D) A "sale," "disposition" or "grant" of rights shall include an assignment, transfer or license of the rights referred to or of any interest or option relating to such rights.

16

(E) "high discount sales" shall mean sales made in the United States where the discount to jobbers or to wholesale distributors or booksellers on copies of any edition published by the Publisher is forty-six percent (46%) or more (except for "special discount sales" and "remainder-in-place sales" as defined below);

(F) "special discount sales" shall mean sales made in the United States outside regular trade channels at a discount of more than 60% from the catalog retail price, except that for audio editions of the Work "special discount sales" shall mean sales at a discount of more than 65% from the catalog retail price. With respect to special discount sales to organizations. Publisher may imprint the trade name, trademark, logo, imprint and/or other identification of such organization on such copies in addition to or in lieu of Publisher's trade name, trademark, logo, imprint and/or other identification;

(G) "remainder-in-place sales" shall mean sales made in the United States in regular trade channels at regular trade discounts, for which a 50% credit to the bookseller is subsequently given by Publisher.

(H) "book manufacturing cost" shall mean the cost incurred for text and cover. The cost is calculated by the number of copies printed.

(I) "freight shipping cost" shall mean the cost incurred from book manufacturing company to Publisher warehouse.

(J) "inside book layout" shall mean the cost incurred to transfer said Work from Microsoft Word document to a book manufacturing-friendly document. Usually but not limited to a Pagemaker file.

(K) "editorial cost" shall mean the cost incurred to have content of Work, proof-read, content edited and developmental editing.

### VIII. Miscellaneous Provisions

#### Assignment

35.     This Agreement shall be binding upon and inure to the benefit of the executors, administrators and assigns of the Author, and upon and to the successors and assigns of the Publisher. The Author shall not assign this Agreement without the prior written consent of the Publisher, except that Author may assign sums due and payable to the Author hereunder, provided that such assignment shall not be binding upon Publisher unless and until Publisher shall have given written acknowledgment of its receipt thereof and such assignment shall not in any event affect Publisher's rights or Author's obligations hereunder. Any purported assignment in violation of this provision shall be void.

#### Effectiveness

36.     This Agreement shall be binding only when it has been signed by the Author and by an authorized officer of the Publisher.

#### Jurisdiction

17

37. Exclusive jurisdiction for the determination of any dispute solely between or among parties to this Agreement is hereby vested in the federal and state courts sitting in New York County. New York. to which each party irrevocably submits. In addition to service of process by any other means provided at the time by law. each party consents to service of process on him, her or it, as the case may be, by certified mail, first class postage prepaid, return receipt requested, or by overnight courier service provided a signed receipt is obtained, in each case addressed (i) to the party to be served at the address to which notices may be given pursuant to Paragraph 38 of this Agreement or (ii) to that party's actual residence or place of business. The refusal to accept process so served, including the failure to claim certified mail in the custody of the Postal Service, shall not invalidate such service if a separate copy of the process is sent by first class mail. postage paid. to the same address.

### Notices

38. All notices to be given hereunder by either party shall be in writing and shall be sent to the other party at the respective addresses given on page 1 of this Agreement, unless said addresses are changed by either party by a notice in writing to the other party. All notices shall be sent by registered or certified mail or other form of receipted or acknowledged delivery including a fax transmission acknowledged as received by the party to which it is sent.

### Applicable Law

39. THIS AGREEMENT AND ITS INTERPRETATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND ENTIRELY TO BE PERFORMED THEREIN.

### Waivers

40. No waiver of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof, shall be deemed a waiver of any other term or condition of this Agreement or of any later breach of this Agreement or of any part thereof, nor shall publication or continued publication or payment by the Publisher following notice or claim of facts which. if true. would constitute a breach of warranty, representation or agreement of the Author, constitute or imply any waiver by the Publisher of any defenses. rights or remedies of the Publisher. No failure by either party to assert any right under this Agreement shall preclude any later assertion of such right.

### Validity and Enforceability

41. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions hereof, and any such invalid or unenforceable provision shall be deemed to be severable.

### Singular Shall Include Plural

42. Wherever required by the context in this Agreement. the singular shall include the plural, and the term "Author" shall include the "Authors" if there are more than one.

### Entire Agreement

18

43.    This Agreement constitutes the entire understanding of the parties concerning the subject matter hereof. and may not be modified except by an instrument in writing signed by the party to be charged.

Captions

44.    Captions are for convenience only, and are not to be deemed part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

AUTHOR                                         MELODRAMA PUBLISHING. LLC

Signature: _____                  _____
                                               Crystal Winslow. Publisher
Soc. Sec.#: _____ REDACTED
Citizenship: _____ U S .

19

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

Melodrama Publishing LLC

                                Index No.:

                Plaintiff,

-against-

                                **PROOF OF SERVICE OF**
                                **VERIFIED AMENDED**
                                **COMPLAINT**

K.S. Publications and Kiki Swinson,

                Defendants.

---

       I, **Jorge J. Delgado**, an attorney duly authorized to practice in the State of New York, do hereby affirm that the following is true under the penalty of perjury pursuant to CPLR 2106:

       I am not a party to this action, am over 18 years of age, and on November 23rd, 2010, I served a true copy of the foregoing **AMENDED VERIFIED COMPLAINT** (the "Verified Pleading"), on the attorneys for the Defendant, by mailing and e-mailing a copy of the document to:

       **LYNN & CAHILL**               **Tel:**    **212-719-4400**
       **c/o Ronald W. Adelman, Esq.**
       **58 West 40th Street**
       **New York, New York 10018**
       **radelman@lynncahill.com**

**Dated: New York, New York**
       **November 23, 2010**                           By

                                                  Jorge J. Delgado